# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Application of the Park District*, 2013 IL App (1st) 110334

---

| | |
|---|---|
| Appellate Court Caption | *In re* APPLICATION OF THE PARK DISTRICT OF LA GRANGE, a Body Politic and Corporate Organized and Existing Under the Laws of the State of Illinois, to Sell a Parcel of Land Less Than Three Acres in Area (The Park District of La Grange, Petitioner-Appellee, v. The La Grange Friends of the Parks, Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-0334 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | September 5, 2013<br><br>October 9, 2013<br>October 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A trial court's order granting a park district's application to sell just under three acres of park district land pursuant to the Park Commissioners Land Sale Act was affirmed, since the trial court had jurisdiction over the matter, the Act does not violate the separation of powers clause of the Illinois Constitution, the proper standard of proof was applied, and no evidentiary errors were committed, and, furthermore, the park district's determination that the land was no longer needed, useful or necessary for the district's operation and that the sale would be in the public interest was neither arbitrary nor capricious, and the trial court's decision was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-09421; the Hon. Susan Fox Gillis, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas Paul Beyer, of Beyer Law Offices, PC, of La Grange, for appellant. |
| --- | --- |
| | Robert K. Bush, Ellen K. Emery, and Daniel J. Bolin, all of Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer, P.C., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HOWSE delivered the judgment of the court, with opinion. |
| | Justices McBride and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1    Gordon Park is an approximately 17-acre park near the intersection of La Grange Road and Ogden Avenue in La Grange, Illinois. On March 3, 2009 petitioner the park district of La Grange (Park District) filed an application to the circuit court of Cook County under the Park Commissioners Land Sale Act (Act) (70 ILCS 1235/1 *et seq.* (West 2008)) to sell two parcels of land in Gordon Park. Respondent the La Grange Friends of the Parks (Objector) filed an objection pursuant to the Act. Following a trial on the application, on October 8, 2010 the circuit court granted the application. For the following reasons, we affirm.

¶ 2                        BACKGROUND
¶ 3                    1. Procedural History
¶ 4    The Park District filed an application for sale of land under section 1 of the Act (70 ILCS 1235/1 (West 2008)). The application stated that the board of commissioners of the Park District (Board) determined by resolution that property comprising 2.82 acres, commonly referred to as Parcel 2 and Parcel 3 of Gordon Park in La Grange, Illinois (collectively, Parcel 2 and Parcel 3 are referred to as West Gordon Park), are no longer needed, necessary, or useful for the purposes of the Park District and that the Board found the sale of the property to be in the public interest. The Board is not a party to these proceedings. The Board's resolution states that the land was previously used by the Park District for various maintenance activities that were transferred to its main recreation center and offices.

¶ 5    The Park District stated it had negotiated the sale of the land to Atlantic Realty Partners, Inc. (ARP), and that the sale was contingent on the trial court's approval of the sale. ARP is not a party to these proceedings. The application listed reasons the parcels are "unnecessary" and listed the benefits of the sale of the land. The benefits included a list of proposed uses of the proceeds of the sale. The application stated that in addition to the Board's legislative determination in its resolution making findings of fact and authorizing the sale of the

-2-

property, the voters of the park district approved the sale in a referendum in the November 4, 2008 general election.

¶ 6    In September 2007 the Park District had filed a petition for sale of land no longer needed for park purposes. The trial court found that the September 2007 application encompassed a vacated portion of Shawmut Avenue in La Grange (hereinafter, vacated Shawmut Avenue) *that the park district owned* and which is appurtenant to the land at issue in this case. The inclusion of vacated Shawmut Avenue took the total amount of land embraced in the application above three acres, and, therefore, the court lacked jurisdiction under the Act. The Park District stated that in November 2008 it exchanged vacated Shawmut Avenue for land owned by the Village of La Grange (Village) pursuant to an agreement for transfers of property by the Park District to the Village (exchange agreement). The Park District transferred vacated Shawmut Avenue to the Village by warranty deed, and the Village became sole owner before the Park District filed the March 2009 application. The Village dedicated vacated Shawmut Avenue for use as a public right of way and granted the Park District a temporary easement to remove a maintenance shed that encroaches on vacated Shawmut Avenue and to perform environmental testing and remediation.

¶ 7    The exchange agreement contains a reverter clause. The reverter clause acknowledges that pursuant to a village ordinance vacated Shawmut Avenue is to be constructed as a public roadway owned by the Village, and the Village's transfer property is to be developed as part of a renovated Gordon Park, "if the Developer [ARP], builds a proposed redevelopment." The reverter clause provides that the properties will revert to their original owners if ARP "has not (1) posted performance security with the Village in a form satisfactory to the Village and (2) commenced earthmoving activity for the Redevelopment by December 31, 2009, or some later date certain to which the Park District and the Village may agree in writing." The Park District and the Village agreed to extend the time limit to January 31, 2010, and agreed to a second extension to December 31, 2010. Subsequently, the Park District and the Village executed a first amended exchange agreement extending the time limit to December 31, 2012 and removing the reference to ARP as the developer.

¶ 8    On April 3, 2009 Objector filed an appearance as objectors to the application.

¶ 9    On June 22, 2009, in separate proceedings not involved with this appeal, the circuit court of Cook County entered an order finding that an auction of the property that was the subject of the September 2007 application (the land at issue here) is void and without legal effect and enjoining the Park District and ARP from carrying out any sale of the property. This court dismissed the appeal of that judgment as moot because the Park District is no longer attempting to sell the subject property pursuant to the referendum.

¶ 10    On September 10, 2009 Objector filed its response to the application. On September 14, 2009, the trial court permitted Objector to engage in discovery.

¶ 11    On March 31, 2010 the Park District and Objector each filed a motion for summary judgment. On April 26, 2010, Objector filed a motion to strike affidavits attached to the Park District's motion for summary judgment, a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)), and a notice of constitutional challenge. Objector's motion to dismiss argues the Act is unconstitutional in

-3-

that it violates the separation of powers clause of the Illinois Constitution. On June 4, 2010, the trial court entered an order on the parties' cross-motions for summary judgment and Objector's motion to dismiss on constitutional grounds. The court made the following findings: (1) the burden of proof is on the Park District; (2) the Park District has the burden to prove its decision was not arbitrary and capricious; (3) the Act is constitutional; (4) the motion to dismiss is denied; and (5) the cross-motions for summary judgment are denied.

¶ 12        On June 9, 2010, Objector filed a motion for an order to certify a question pursuant to Illinois Supreme Court Rule 308 (Ill. S. Ct. R. 308 (eff. Feb. 26, 2010)). On June 10, 2010 the trial court granted the motion and ordered Objector to provide the court with its comments on the proposed questions contained in the court's proposed order. On June 29, 2010, the court entered an order vacating the June 10, 2010 order and denying Objector's motion to certify question. The court rescinded its earlier order and set the matter for trial beginning on July 23, 2010.

¶ 13        On July 20, 2010, Objector filed a notice of motion for clarification. The motion states that its purpose is to obtain a statement of the relevant law for this matter, the current posture, and guidance on how the court intends to proceed in the area of (1) the scope of authority granted to a park district, (2) how statues are to be construed, and (3) constitutionality of these statutes. On July 26, 2010, the Park District filed its response to Objector's motion for clarification and on August 2, 2010, Objector replied. On August 27, 2010, the trial court entered an order on Objector's motion to clarify. The court found that (1) the Park District bears the burden of proof and shall present its evidence first; and (2) the court shall apply the arbitrary and capricious standard. The court's order set the matter for trial beginning on October 5, 2010.

¶ 14        On September 23, 2010, the Park District filed a motion for leave to file an amended application under the Act. The motion stated that the Board's resolution determined that it was in the public interest to sell the land pursuant to the terms of a sales contract in place with ARP, but that due to changes in real estate values, the Board determined to modify the terms of sale. The Board adopted a new resolution to modify the terms to sell Parcel 2 and Parcel 3 for $2,985,000 or the average of three valuations of the property from three different "Member of the Appraisal Institute" (MAI) appraisals and in-kind services related to the sale of the property and/or the improvement and development of Gordon Park, to be agreed upon and accepted by the Board. The Park District sought to amend the application to specifically state the modified terms of the proposed sale. The Board's second resolution "re-adopts the findings of fact contained in [the first resolution,] and makes the legislative determination that said findings of fact support the adoption of the minimum terms of sale set forth in *** this Resolution." The resolution also specifically found that "It is the legislative determination of the Board *** that the sale of the Property *** will be for the public interest" and "there is a rational relationship between the proposed sale *** and the generation of revenue to support the proposed improvements for Gordon Park described in [the original resolution]."

¶ 15        On October 5, 2010, Objector moved to dismiss the amended application. The motion to dismiss argued that the Park District was seeking to sell more than three acres because vacated Shawmut Avenue is involved in and necessary to the transaction to sell Parcel 2 and

Parcel 3. On October 5, 2010, the trial court entered an order on Objector's motion to dismiss. The court found that "the land which [the Park District] is applying to sell under its amended application is less than 3 acres." The court found that it has jurisdiction over the amended application and denied the motion to dismiss. The same day the court entered a separate order granting the Park District's motion for leave to file an amended application and granted the Park District leave to file the amended application *instanter*.

¶ 16        On October 8, 2010, following a trial, the trial court entered a written order authorizing the Park District to sell all or part of 2.88 acres of land commonly known as Parcels 2 and 3 in Gordon Park at a price to be established by calculating the average of three MAI appraisals. On November 8, 2010 Objector filed a posttrial motion to vacate judgment. On December 22, 2010, the Park District filed a response to Objector's posttrial motion, and on January 18, 2011, Objector filed a reply. On January 20, 2011, the trial court denied Objector's posttrial motion with prejudice. In the same order, the court granted the Park District's motion to strike an answer and objection to the Park District's amended application, which Objector filed after the court entered the judgment.

¶ 17        On January 25, 2011, Objector filed a notice of appeal. The notice of appeal specified the following orders: (1) the June 4, 2010 finding that the Act is constitutional, and the arbitrary and capricious standard applies, and denying Objector's motion for summary judgment; (2) the June 29, 2010 order reversing the June 10, 2010 order granting interlocutory appeal; (3) the August 27, 2010 order denying Objector's motion to clarify; (4) the October 8, 2010, judgment authorizing the sale of the land; and (5) the January 20, 2011 order denying Objector's posttrial motion to vacate[1].

¶ 18                                    2. Evidence at Trial

¶ 19        The parties adduced the following evidence at the trial on the Park District's application pertinent to the resolution of this appeal.

¶ 20                                      A. Park District

¶ 21        Don Robertson, a member of the board of the American Youth Soccer Organization (AYSO) testified he plans which players play on which fields in La Grange based on player age and the size of the field. AYSO formerly played games in the area of the park occupying the northwest corner–which is included in the land at issue in this case–but stopped. He stopped using West Gordon Park because the land slopes to the east, there is a tree in the area that collects bees, presenting a problem for the younger soccer players who used that portion of the park. The most severe problem for the young and inexperienced soccer players who played there was the severe slope of the property. The areas in the eastern portion of Gordon Park could accommodate a field for younger players, who make up the majority of children

---

[1]Also on January 25, 2011, Objector filed a motion to stay the judgment pending appeal without bond pursuant to Illinois Supreme Court Rule 305 (Ill. S. Ct. R. 305 (eff. July 1, 2004)). On January 28, 2011, the trial court denied the motion.

in his program. Robertson testified he does not use the "main" portion of Gordon Park–which is not included in the proposed sale and is at times referred to as East Gordon Park–because it holds water, which might result in the cancellation of games. The eastern portion of Gordon Park will not accommodate a full-sized soccer field. He testified that having a full-sized soccer field at Gordon Park would benefit his program. Robertson testified the west area could be used for other recreational activities.

¶ 22    Thomas Cushing, president of the La Grange Little League, testified Gordon East was used for ladies' softball within the past year on a reduced basis. In April 2009 18 of the first 24 ladies' softball games scheduled at Gordon Park were rained out on the same nights games were being played at other parks in the area. The south baseball fields retain water and would be unplayable for up to five days after a rain. In 2010 Cushing pulled one boys' baseball league's games from Gordon East, as well as 96 out of 125 ladies' softball games. Gordon Park has no permanent bleachers, no permanent bathroom, and no concession stand. Cushing does not know what is causing the south fields in Gordon East to gather water.

¶ 23    Jim Farnan, who was president of the La Grange Little League in 2007 and 2008, testified the fields in East Gordon Park were unreliable because they would flood after rain. Other fields would be back in use two or three days after rain, but Gordon Park would still be shut down, resulting in cancelling or rescheduling games. The fields have very little shade and some teams' managers brought tarps to cover dugouts to provide shade. The parking lots are a long distance from the ball fields, and there is no running water and no water fountains. Farnan agreed West Gordon Park could be used for various recreational activities like Frisbee or bocce ball. His children did not use the playground in West Gordon Park because it was out of sight of the ball fields. Farnan testified rainouts happen often in Gordon East and more frequently than at other parks. He first noticed problems with the fields in Gordon Park in 2006.

¶ 24    Kate Gronan has worked as a marketing consultant for the Park District, working with it to draft news releases and to prepare information about the proposed sale. Gronan founded a political action committee (PAC) to encourage citizens to vote in favor of the referendum to sell the land in Gordon Park. That PAC's primary source of funds was private contributions by ARP. Gronan has lived in La Grange for 19 years and testified that West Gordon Park was "not that usual a place to go." She primarily went to Gordon Park for specific events. Between 1997 and 1998 Gronan arranged play groups at local playgrounds but never used West Gordon Park, but in the area in which she lives, Gordon Park would not be a "natural destination." Gronan has attended community events in the eastern portion of the park.

¶ 25    Richard Aaronson is the president of ARP. ARP was selected through a competitive bid process to develop a mixed use community at the corner of La Grange Road and Ogden in La Grange. ARP's original bid was to purchase only the former YMCA site, which is adjacent and to the south of the Park District's property in West Gordon Park. But discussions with the Village led to the incorporation of "surplus property" belonging to the Park District. The Park District informed ARP what "surplus property" it had at the site of the proposed development, and the parties entered a purchase agreement in 2006 for a purchase price of $4.5 million and services related to the renovation of the eastern portion

of Gordon Park. Aaronson testified ARP would be purchasing Parcel 2 and Parcel 3 and not vacated Shawmut Avenue.

¶ 26    ARP never completed the purchase. Aaronson testified ARP later made a revised proposal for $2,985,000 and services related to the redevelopment of the eastern portion of Gordon Park. ARP never reached a final agreement with the Park District to purchase the subject property and has no binding agreement to build the proposed development. ARP is still interested in buying the property, if the Park District can sell it.

¶ 27    Bradley Belcaster is a member of the Board. Parcel 2 contains an unused maintenance shed and a small play area. The rest of Parcel 2 is paved area. Parcel 3 consists of trees, grass, and a small gazebo, and two tennis courts. The agreed to price of $4,555,866 included coordinating with ARP's development work to bring utilities into Gordon Park and re-engineering the park for storm water drainage. Coordinating the work in this manner would result in savings to the Park District from having to complete that work independently. The Park District was unable to complete the sale because it was unable to deliver title. The Board received ARP's revised proposal by letter dated October 14, 2009. The Board agreed to accept the revised proposal after discussing issues regarding earnest money and the enumeration of the additional services. Belcaster testified the zoning for ARP's project had expired. The Park District has had no discussions with ARP since October 2009.

¶ 28    Robert Metzger testified that he was a Park District commissioner in La Grange for eight years, ending in June 2010. The Park District had discussions as to why to sell the subject property. When the decision was made, Parcel 2 was mostly consumed by a vacant maintenance facility. The Park District had purchased a recreation center and one-third of that new facility was used as a larger maintenance facility. Metzger described Parcel 3 as "not part of the *** main part of the park." During soccer season Parcel 3 was used as a very small soccer field for very small children. The playground was "challenging" because it was out of sight. The Park District discussed whether Parcel 2 and Parcel 3 were useful and necessary. Metzger testified Parcel 2 "was an easy one because of the fact that the maintenance facility sat on there and clearly that no longer was *** there." As to Parcel 3, Metzger testified, it "was really not very useful for any particular benefit." Parcel 3 had no significant use other than as a soccer field, but there is a playground on Parcel 3. The last time Metzger was on Parcel 3, a year before his testimony, the playground was surrounded by a fence because it was in disrepair. The Park District did not attempt to repair it because it was attempting to sell that land. Also, maintenance of the subject property "was more challenging because of the access to it and the ability to maintain it at the same level that we have the rest of the parks."

¶ 29    Metzger testified that the primary reason for the decision to sell Parcel 3 was that it provided very limited utility because it was not used for active programming and "was not used very much for inactive programming." The sale of Parcel 3 would not result in any reduction to the Park District's programs and would benefit the rest of Gordon Park because proceeds of the sale were to be used to redesign and redevelop the rest of the park. There was a plan to redevelop the remainder of the park, but the Park District lacked the funds to do them without the sale. Metzger agreed Parcel 3 could be used to "toss the ball around" and activities one could do other than organized sports.

¶ 30    Metzger also testified that the property the Park District received under the exchange agreement was primarily used for parking at the park even before the exchange, but the Park District did not own the property. Metzger testified that as far as he knew the YMCA has pulled out of the project. If the maintenance building on Parcel 2 were removed the land could be returned to parkland at a cost. A cost of $40,000 to return Parcel 2 to usable parkland would be a "pretty good deal" but not necessarily the optimal use of those funds or the optimal use of the land. He testified there is a tremendous need for active recreation space in La Grange.

¶ 31    Constantine Bissias is the Park District's executive director. He was formerly park foreman and in that capacity was in charge of equipment and crews. The crews could not mow Parcel 3 on rainy days because of the slope of the land and due to fences on the north and south sides. He also testified that the ball fields on the east side of Gordon Park have a problem holding water. Bissias was involved in the purchase of the new recreation center. The Park District issued a bond to purchase and renovate the property but had to use capitol funds to complete the building. The Board planned to use proceeds from the sale of the maintenance facility on Parcel 2 to replenish capital funds. The Park District held no recreation programs on Parcel 2 or Parcel 3, but holds hundreds of recreation sessions annually. In the past two years, two festivals have occurred in Gordon Park, during which the flat portion of West Gordon Park was only used for overflow parking.

¶ 32    The Board discussed whether Parcel 2 and Parcel 3 were useful and necessary and concluded they were not because of their location, lack of use, problems with maintenance, because the playground had been vandalized and the cost of repair was escalating, and the fact the property was hidden. The playground is behind the maintenance shed. A picnic pavilion sits on the property. In the last five years only "a couple" of permits have been issued to use the pavilion.

¶ 33    The Park District held public meetings to obtain public input as to what improvements it would like to see to Gordon Park. Planned improvements to the east side of Gordon Park include a full-sized soccer and football field, turning two remaining softball fields to utilize a concession stand area, a concession stand with bathroom, a splash pad, skate spot, passive area, band shelter, lighted paths with exercise stations, a sled hill, and butterfly garden. The plan also involved adding drainage to solve the water problem. The cost of the planned renovations exceed $5 million. The Park District planned to use a combination of grants and its capital fund to pay for the renovation, and as funds became available. Bissias testified that the renovations would make Gordon Park more usable for activity in passive areas and improve vehicular access. The west side of Gordon Park is within walking distance of residents of two multiple-story buildings adjacent to the property and another residential area.

¶ 34    Prior to Bissias becoming superintendent, the Park District spent $90,000 on a drainage system and $75,000 to renovate the fields at Gordon Park. There has never been an investigation into fixing the drainage system currently in place. Under the exchange agreement, the Park District increased its land and could add an additional parking lot at Gordon Park if necessary. The Park District has already requested bids for the first phase of renovations in the eastern portion of Gordon Park but does not have the funds to complete the project. The Park District has received a grant to pay for some of those renovations.

¶ 35     Jeffrey Braun owns the architecture firm Cody Braun and Associates (Cody). Cody evaluated Parcel 2 and Parcel 3. Portions of Parcel 3 have a 4% to 7% slope. The western portion of the park is hidden from the main portion. Gordon Park is in a "bowl" and the lowest part of the bowl is the center of the current ball field configuration. The four existing ball diamonds overlap, making it difficult to have simultaneous games. The park has no pathway system or restrooms. Braun stated the park is currently under-utilized. Cody created a plan to redesign Gordon Park that includes a large passive area, and to address the recreational needs of seniors and provide areas for children–including a play area and skate spot. The plan includes creating a sled hill likely to have a 20% slope. The new design would have storm sewers around the perimeter, rather than the existing storm sewer down the center.

¶ 36     Plymouth Place is a high rise building at the west end of Parcel 3. Nothing in the redesign would prevent pedestrians from the buildings on the west end of Parcel 3 from entering the park by foot. The current plan calls for retaining one of the four tennis courts currently in Gordon Park, but there have been discussions about having two tennis courts. The passive areas in the redesigned park would not accommodate "pick up" games of football or baseball or soccer, but they would accommodate Frisbee or other nonorganized sporting activities. Braun testified the western area is not conducive to active sports but admitted the area could be used to play pick up games, horseshoes, or bocce ball. Under the ARP proposal, an area that is currently only used for parking would become a through street. He agreed it is more expensive to design a park with more active space than passive space.

¶ 37     Timothy Kelpas was a Park District commissioner in 2005 and 2009, and has volunteered extensively in La Grange. He has chaired the Park District Senior Innovation Task Force committee and recreation committee. Parcel 2 and Parcel 3 are discontinuous with the main portion of Gordon Park. Its visibility is "extremely obstructed." Kelpas testified that the basis of the Park District's discussions on whether Parcel 2 and Parcel 3 were useful or necessary was that "there was an underutilized piece of *** property that could be utilized in order to serve the needs of the taxpayers and Park District *** to increase its level of service." There is on Parcel 2 a fenced in storage yard "filled with *** junk." The Park District runs no programs on Parcel 2 or Parcel 3 except soccer games for very young players. Kelpas testified that the sale of the property would not result in any decrease in programs or activities. The Park District needs the money from the sale of Parcel 2 and Parcel 3 for the Gordon Park redevelopment plan to be executed. Kelpas once called police regarding persons drinking from two kegs of beer in the park. Police drove into the park from the eastern most edge of West Gordon Park and drove down the slope in West Gordon Park.

¶ 38                                    B. Objector

¶ 39     Edward Kram testified he is the manager for the Friends of the Park. He jogs in Gordon Park. Kram had seen organized youth soccer in West Gordon Park within the last year to two years. It was not AYSO soccer. The YMCA utilized West Gordon Park for its day camp and Kram observed the day camp setting up picnic supplies and children on the playground. Kram played tennis in Gordon Park as a youth but has not played there recently because the

courts are "in terrible disrepair." He testified the park had made no improvements and the courts have deteriorated since 2007. If the building on Parcel 2 were removed it would be possible to do some sledding in that area.

¶ 40 Roy Cinquegrani is the general manager of Haltz Construction, which is in the business of demolition and restoration. He testified the cost of removing the metal structure on Parcel 2, the concrete beneath the metal building, and the brick building would total $31,857. He testified he would be willing to take the buildings down for the Park District for that price.

¶ 41 Cheryl Ciecko-Goethals was a Park District commissioner from 2000 to 2004. During her tenure the ball fields at Gordon Park were highly used.

¶ 42 Steven Blatz testified for Objector. He is a professional landscaper and testified that the slopes in West Gordon Park are more difficult to mow. He also testified that "if you train your people correctly, they are no more difficult than the east end of Gordon Park if they know what they're doing." Blatz did not state that it would take the same amount of time to mow flat land than land with a slope like in West Gordon Park, but said it would be "close."

¶ 43 The trial court made an oral finding that the Park District sustained its burden of proof and entered a written order granting the application.

¶ 44                              ANALYSIS

¶ 45 Objector asserts, as "preliminary matters" that the Park District has no inherent powers because it is a non-home-rule government entity and, therefore, only has the powers delegated to it by the legislature. Objector argues that the Act does not give the Park District the authority to determine whether the sale of park land is in the public interest, therefore the Park District's resolution, finding that the sale of the land is in the public interest, is void. We disagree.

¶ 46 Every park district has the power to "pass all necessary ordinances, rules and regulations for the proper management and conduct of the business of the board and district and to establish by ordinance all needful rules and regulations for the government and protection of parks, boulevards and driveways and other property under its jurisdiction, and to effect the objects for which such districts are formed." 70 ILCS 1205/8-1(d) (West 2008). The question, however, is what is the legal effect of the resolution as it pertains to an application under the Act.

¶ 47 Objector also argues the Act does not give the Park District authority to sell park land, but only the power to request leave to sell park land. Objector argues the Park District does not have authority to sell the land because (1) under the referendum procedure, the public decides whether to sell park land, and (2) under the application procedure, the court decides whether to sell park land. We find this argument inapposite because the Park District does have the authority under the Act to apply for leave to sell the park land at issue and, for the reasons that follow, the trial court properly granted the application to sell the land.

¶ 48                    1. Trial Court's Jurisdiction

¶ 49 "We review *de novo* whether a trial court's order falls within the authority the legislature

-10-

has granted." *In re Keri B.*, 327 Ill. App. 3d 1068, 1070 (2002). Objector argues that the contract to sell Parcel 2 and Parcel 3, together with the exchange agreement regarding vacated Shawmut Avenue, "is one transaction involving all three parcels" and, therefore, the "application" is to sell more than three acres, and the trial court is without jurisdiction. Objector argues that transfer of any one of the parcels is contingent upon the transfer of all. According to Objector, the Act does not permit dividing park land into smaller parcels and selling them to separate parties. The Park District responds vacated Shawmut Avenue is not part of the amended application. Vacated Shawmut Avenue could not be part of the amended application because the Park District does not own it. The Park District argues that the fact the ARP contract and the reverter clause in the exchange agreement are both tied to the sale of Parcel 2 and Parcel 3 does not make vacated Shawmut Avenue part of the current application to sell Parcel 2 and Parcel 3.

¶ 50       We do not agree with Objector that the exchange agreement and application for sale evince a single transaction. The purpose of the application is to decide whether the Park District *may* sell Parcel 2 and/or Parcel 3. The trial court's order would only decide the Park District's ability to sell those parcels. Any order will not, of its own authority, result in a transfer of vacated Shawmut Avenue. The fact that the development, or failure to develop, Parcel 2 and Parcel 3 is a fact that may or may not trigger an event in a separate transaction does not bring vacated Shawmut Avenue within the scope of the application.

¶ 51       Objector's argument does implicitly raise a question of statutory construction. The question presented is whether the Act permits a park district to sell or transfer parcels of property in one "park" in separate transactions. The construction of a statute is a question of law that is reviewed *de novo*. *Hall v. Henn*, 208 Ill. 2d 325, 330 (2003) ("courts should consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it. [Citation.] The best indication of legislative intent is the statutory language, given its plain and ordinary meaning."). We find the Act does permit transfers of parcels within one "park" in separate transactions.

¶ 52       The Act provides, in pertinent part, as follows:

"Any board of park commissioners having the control or supervision of any public park *** and having any *piece or parcel* of land not exceeding 3 acres in area, which shall no longer be needed or deemed necessary or useful for the purpose of said park *** may apply to the Circuit Court of the county in which such *piece or parcel* of land is situated, by petition in writing for leave to sell the same. *** After hearing all persons interested, if said court shall deem the granting of said application to be for the public interest, it shall direct that the property mentioned in said application, *or any part thereof*, be sold and conveyed by the said board of park commissioners for the use of said park, boulevard, driveway or highway, upon such terms and conditions as the said court may think proper." (Emphases added.) 70 ILCS 1235/1 (West 2008).

¶ 53       The Act provides for the sale of "any piece or parcel" within a public park. Nothing in the language of the Act prohibits a park district from multiple transactions or making multiple applications with respect to land within a single park. The language of the statute directly refutes Objector's argument that the Act does not permit dividing park land into

smaller parcels and selling them to separate parties. The Act expressly permits an application to sell any piece of land that does not exceed three acres. Even upon application to sell a piece of land, the trial court has the authority to authorize the sale of only "any part" of the piece of land described in the application. Objector has provided no authority to support its implicit conclusion that the legislature intended to limit a park district's authority under the Act by examining every transaction with respect to a single park in the aggregate to determine if the trial court has jurisdiction over a pending application. The Act contains no limitation on the frequency or number of applications a park district may file, and the plain language of the Act demonstrates the legislature's intent that separate transactions may arise with regard to a single public park.

¶ 54   The Park District exercised a valid exchange of vacated Shawmut Avenue with the Village. Then, in a separate transaction, the Park District applied to the circuit court to sell Parcel 2 and Parcel 3 under the Act. There is no genuine dispute that Parcel 2 and Parcel 3 do not exceed three acres. There is nothing in the Act to suggest the legislature did not intend to permit just this type of series of transactions. Objector calls the Park District's conduct the type of subterfuge meant to circumvent the requirements of the statute that our supreme court rejected in *In re Petition of the Village of Kildeer to Annex Certain Territory*, 124 Ill. 2d 533, 547 (1988). *In re Petition of the Village of Kildeer* is distinguishable and its reasoning commands a different result in this case.

¶ 55   In *In re Petition of the Village of Kildeer*, our supreme court wrote that "[i]t is axiomatic that a party cannot circumvent the purpose of the statute by doing indirectly what he cannot do directly." *In re Petition of the Village of Kildeer*, 124 Ill. 2d at 547. There, the issue of statutory interpretation was whether section 7-1-2 of the Municipal Code (Ill. Rev. Stat. 1985, ch. 24, ¶ 7-1-2) "permits a municipality to carve out a parcel of land of less than 10 acres from a tract of land greater than 10 acres." Section 7-1-2 provided, in pertinent part, as follows: "no tract of land in excess of 10 acres in area may be included in the ordinances of a municipality initiating the proceedings." Ill. Rev. Stat. 1985, ch. 24, ¶ 7-1-2. The Village of Kildeer petitioned to annex parcels of land of less than 10 acres under 3 separate petitions, but each 10-acre tract was "carved out of tracts of land in excess of 10 acres." *In re Petition of the Village of Kildeer*, 124 Ill. 2d at 545-46. Our supreme court held that the statute "prohibits a municipality from carving a parcel of less than 10 acres from a tract greater than 10 acres." *Id.* at 547. Because the ordinances at issue were an attempt at annexation from a tract greater than 10 acres the ordinances were invalid. *Id.*

¶ 56   However, the language of section 7-1-2 of the Municipal Code in *In re Petition of the Village of Kildeer* and the language of the Act at issue in this case differ on the very point of departure for our supreme court's finding the Village of Kildeer's ordinances to be invalid. Our supreme court found that under the Municipal Code, the annexation ordinance could not redefine the size of the parcel to be annexed. "The location and the boundaries of the tract which the municipality seeks to annex must be determined by a source independent of the annexation ordinance itself. The ordinance can only attempt to annex an already existing tract of land. The ordinance does not create a tract of land." (Emphasis omitted.) *In re Petition of the Village of Kildeer*, 124 Ill. 2d at 547. This is because the legislature "specifically used the singular form of the word 'tract' and the plural form of the word 'ordinance.' Therefore,

-12-

the legislature clearly intended that a municipality may not annex a tract of land which exceeds 10 acres, no matter how many ordinances it adopts to annex that tract of land." *Id.* at 546-47.

¶ 57    Our supreme court interpreted the relevant language of the Municipal Code, not necessarily as a limitation on the size of the annexation, but a limitation on the size of the parcel to which the Municipal Code extended. *In re Petition of the Village of Kildeer*, 124 Ill. 2d at 547 ("serious practical difficulties would result if a municipality were allowed to annex less than 10 acres out of a tract greater than 10 acres"). In this case, the Act does not contain a similar restriction. Under the Act, the Board may petition for leave to sell "any piece or parcel of land not exceeding three acres" in "any public park." 70 ILCS 1235/1 (West 2008). Thus, under the plain language of the Act, since the Board may petition to sell "any" parcel under three acres, as opposed to "a parcel" under three acres, it is clear that the legislature intended to allow the Park District to apply to sell more than one parcel of less than three acres in one park. Thus, there is no violation in entering multiple transactions to sell parcels of less than three acres under *In re Petition of the Village of Kildeer*.

¶ 58    Moreover, *In re Petition of the Village of Kildeer* is further distinguishable because in that case the court found that the ordinances indirectly violated the statutory scheme under the Municipal Code. The Village of Kildeer passed three ordinances under a single statute specifically for the purpose of circumventing its limitations. *In re Petition of the Village of Kildeer*, 124 Ill. 2d at 542. The same cannot be said here because the transfer of vacated Shawmut Avenue did not occur under the Act. The Park District did not sell vacated Shawmut Avenue. Therefore, we cannot find an attempt to circumvent any statutory scheme that the sale of more than 3 acres of park land must be subject to referendum.

¶ 59    We find that the Board's application expressly sought leave to sell a parcel of land less than 3 acres and further find that no decision on the application would result in transferring more than 3 acres of park land to anyone. Accordingly, we find the trial court had jurisdiction to hear the application.

¶ 60                                        2. Constitutionality of the Act

¶ 61    "[T]he authority to determine public interest is vested in the legislature and cannot permissibly be delegated to the judiciary." *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 478-79 (1994). Objector argues the Act violates the separation of powers clause of the Illinois Constitution of 1970 because it requires the circuit court to make a legislative determination of the public interest.

> "[W]hen assessing the constitutional validity of a legislative act, we must begin with the presumption of its constitutionality. [Citation.] The burden of rebutting this presumption is on the party challenging the validity of the statute and any doubts must be resolved in favor of finding the law valid. [Citation.] This burden is particularly heavy where, as here, a facial challenge is raised. A facial challenge to a legislative act is the most difficult challenge to mount successfully because the challenger must establish that under no circumstances would the challenged act be valid. [Citation.] The fact that the statute might operate unconstitutionally under some conceivable set of circumstances is

-13-

insufficient to render it wholly invalid. As we [have] said *** facial invalidation is, manifestly, strong medicine that has been employed by the court sparingly and only as a last resort." (Internal quotation marks omitted.) *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 33.

¶ 62    In *Fields Jeep-Eagle, Inc.*, our supreme court found that "through *** the [Motor Vehicle Franchise] Act [(Franchise Act)], the General Assembly has impermissibly delegated for judicial examination matters which are for legislative or administrative determination." *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d at 479. The Franchise Act obligated the trial court to determine if there is good cause for permitting the establishment of a motor vehicle franchise. *Id.* at 465. In determining whether good cause had been established, the court was required to consider " 'all pertinent circumstances,' " which may include but are not limited to eleven enumerated "good cause" factors, including whether the proposed dealership establishment or relocation would be in the public interest and welfare. *Id.* at 465 (quoting 815 ILCS 710/12(c) (West 1992)).

¶ 63    Objector argues that the Act similarly delegates legislative authority to the trial court and, therefore, is unconstitutional. We disagree. *Fields Jeep-Eagle, Inc.*, found the Franchise Act unconstitutional, in part, because under the statute "the court's ruling is determinative of *** whether a business may become licensed" and business licensing is a nonjudicial function. *Fields Jeep-Eagle, Inc.*, 163 Ill. 2d at 474-75. The *Fields Jeep-Eagle Inc.* court also found problematic the fact that the Franchise Act required the court to engage in independent fact finding "rather than the application of any fixed standards or rules of law to a set of facts." *Id.* at 476. "The independent determination of what facts are pertinent and the assessment of those facts as they bear upon [the issue] *** are not functions which courts are generally equipped to perform ***." *Id.* at 477. Finally, our supreme court found that the Franchise Act impermissibly delegated to individual judges "the task of independently deciding what the public interest is in each case *** based upon whatever factors the judges consider pertinent, in addition to the competing public and private interests expressed in the [Franchise Act]." *Id.* at 478.

¶ 64    The Act in this case does not suffer the same infirmities noted by our supreme court in *Fields Jeep-Eagle, Inc.* and does not violate the separation of powers clause of the Illinois Constitution. In this case, the trial court's ruling on the Park District's application does not have the effect of making a business licensing determination. Nor is the trial court required to make an independent determination of what facts are pertinent. The pertinent facts under the Act are those that would establish that the subject land is no longer needed, necessary, or useful for the purpose of the park in which it is located. The Act does not give the court the task of independently deciding what the public interest is in the case of an application under the Act.

¶ 65    In *Fields Jeep-Eagle, Inc.*, our supreme court was concerned with the fact the Franchise Act presented the trial court with "statutory purposes and goals [which] are consistent with neither each other nor with various of the competing interests expressed in [the Franchise Act]." *Id.* at 478. The Franchise Act contained no clear statement of the public interest, but instead presented matters for consideration that were "subjective and/or speculative in nature and involve competing public and private interests." *Id.* at 476. Here, there are no competing

-14-

interests expressed in the Act and, unlike *Fields Jeep-Eagle, Inc.*, the Act does not enumerate public policies that are directly competing with the factors the court must consider. *Fields Jeep-Eagle, Inc.*, 163 Ill. 2d at 477-78. Rather, the Act makes allowances for disagreement as to the ultimate conclusion on any individual factor.

¶ 66 "[I]n determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). The Act contains a clear statement of only one public interest. The public interest expressed in the language and purpose of the statute is in whether the subject land is needed, necessary, or useful for the purpose of the park and if the sale of the land would be for the use of the park, which, based on the language of the Act, we construe to include all of the parks under the Board's "control or supervision." Again, the constitutional concerns that led our supreme court to declare the Franchise Act violative of the separation powers clause are not present here. The court, in an application under the Act, may apply fixed standards (needed, necessary, useful) to a set of facts which, if found to exist, would allow the court to grant the application. See *Fields Jeep-Eagle, Inc.*, 163 Ill. 2d at 476.

¶ 67 Nor do we find that the trial court is charged with independently and originally determining whether park land should be sold. *Fields Jeep-Eagle, Inc.*, 163 Ill. 2d at 472.

"[T]he power of the court to determine if administrative findings and orders are lawful and have support in the evidence is not a power to hear new evidence or reweigh the evidence adduced before the administrative agency and, thus, does not transgress constitutional principles. Statutes providing for such procedure merely authorize the court to exercise what is already a part of its function." *Id.* at 471 (citing *West End Savings & Loan Ass'n v. Smith*, 16 Ill. 2d 523, 525-26 (1959)).

¶ 68 This rule applies where "authority has been conferred upon administrative agencies to perform functions of an executive nature." *West End Savings & Loan Ass'n*, 16 Ill. 2d at 525. A court may not "determine and decide matters of an executive or legislative character." *West End Savings & Loan Ass'n*, 16 Ill. 2d at 526. We find that the Act confers authority on the Park District, not the trial court, to make the initial determination that park land is no longer needed, necessary, or useful and that its sale would be for the public interest. That determination is evidenced by the application to sell under the Act. In this case, the application is also supported by the Board's resolution. The determination by the Park District is not prescribed to be in any particular form, thus Objector's arguments that the referendum is void is not an issue. The court in this case received evidence that the Park District "deemed" Parcel 2 and Parcel 3 no longer necessary or useful. It was that determination the court reviewed. The court did not make the determination in the first instance. To so construe the statue would render the opening clause of the statute, describing the findings required of the board of park commissioners before an application "may" be filed, meaningless. See 70 ILCS 1235/1 (West 2008). "Each word, clause, and sentence of the statute must be given a reasonable meaning, if possible, and should not be rendered superfluous or meaningless." *Cushing v. Greyhound Lines, Inc.*, 2012 IL App (1st) 100768, ¶ 97. Thus, we find that the Act does not violate the Separation of Powers clause.

-15-

¶ 69                                3. Trial Court's Judgment

¶ 70    Objector argues the trial court made three specific errors in the conduct of the trial of this matter, each of which we shall address in turn.

¶ 71                                A. Standard of Proof

¶ 72    Objector argues that the trial court applied the wrong standard of proof. Objector agrees the Park District, as the proponent of the application, did have the burden of proof. However, rather than being required to prove that its resolution approving the sale and finding it to be in the public interest was not arbitrary and capricious, the Park District should have been required to prove the sale of the land was in the public interest by a preponderance of the evidence. Objector argues the court's application of the arbitrary and capricious standard was erroneous because that standard applies to challenges to ordinances, which this was not. According to Objector, the Act "neither requires nor authorizes the Park District to make a determination as to whether the sale of park land is in the Public Interest. This determination is delegated to the Court."

¶ 73    First, we have already rejected Objector's argument the Act delegates this responsibility to the trial court. Second, Objector cites no authority for its argument that the Park District has the burden under the Act to prove that the sale of park land is in the public interest by a preponderance of the evidence. The trial court also adopted the view that its role was to review a legislative decision by the Park District. In its ruling on the motion to clarify, the court stated:

> "Here, while the park district has enacted a resolution, this is not a statute. However, it is an action taken by the park district under its legislative function. Thus, this Court reviews the legislative action of the park district under authority of the state statute. As previously noted, the standard of review in such a case is arbitrary and capricious."

¶ 74    We agree with the trial court. Specifically, we construe the language in the Act "which shall no longer be *** *deemed* necessary or useful for the purpose of said park" (emphasis added) (70 ILCS 1235/1 (West 2008)) to refer to a determination *by the Park District* that park land is no longer necessary or useful, before application is made. Giving the language of the statute its ordinary meaning, the Act authorizes an application to the court for leave *to sell* land the Park District has deemed no longer needed, necessary, or useful. The statute does not grant leave to apply to deem the land is no longer necessary or useful. The legislature committed the determination of whether park land is needed, necessary, or useful to the Park District. As previously stated, the sale is for the public interest, as expressed in the language of the Act, if the sale would be for the use of the park.

¶ 75    Where a function is committed to a legislative body, "it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are vested, unless the legislative action *** is shown to be arbitrary, capricious, or unrelated to public health, safety and morals." *Wechter v. Board of Appeals*, 3 Ill. 2d 13, 16 (1954). Because the court is reviewing a legislative determination that park land is no longer necessary or useful and its sale would benefit the park, the standard it must apply is well-defined. "Legislative decisions

made by municipalities are subject to review only for arbitrariness as a matter of substantive due process." (Internal quotation marks omitted.) *Dunlap v. Village of Schaumburg*, 394 Ill. App. 3d 629, 640 (2009). A legislative action is shown to be arbitrary, capricious or unrelated to the public health, safety and morals if the action bears no real and substantial relation to the public health, safety, morals, comfort and general welfare. Therefore, "such decisions will be upheld if they represent a rational means to accomplish a legitimate purpose, as long as a fundamental constitutional right is not implicated." *Dunlap*, 394 Ill. App. 3d at 640.

¶ 76    Based on the foregoing, we hold that the trial court held the Board to the correct standard of proof. As more fully discussed below, the trial court correctly found that the Park District's determination that the land was not needed or useful, and selling the land would benefit the park, was not arbitrary or capricious.

¶ 77                          B. Evidentiary Rulings

¶ 78    Objector argues the trial court erred in admitting certain evidence. Specifically, Objector argues the trial court erred in admitting evidence of potential uses of proceeds of the sale of the land because "financial benefits do not meet the Public Interest requirement." Objector argues the evidence was irrelevant and prejudicial. "The decision to admit or exclude evidence rests within the sound discretion of the trial court, and that decision will not be disturbed absent an abuse of that discretion. [Citation.] Even when evidence is relevant, a trial court may exclude it, if the prejudicial effect of the evidence substantially outweighs its probative value. [Citation.] Prejudice is undue tendency to suggest a decision on an improper basis." (Internal quotation marks omitted.) *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758, ¶ 20.

¶ 79    Objector relies on *People ex rel. Scott v. Chicago Park District*, 66 Ill. 2d 65, 80-81 (1976), and argues that the public trust doctrine applies to property set aside for the use of the public at large, and *Scott* stands for the proposition that financial benefits from the sale of land which is for public use are not sufficient reasons to sell it.

¶ 80    *Scott* is inapposite because its holding is limited to application of the public trust doctrine to submerged land. *Scott*, 66 Ill. 2d at 77 ("It can be seen that the State holds title to submerged land, as is involved here, in trust for the people, and that in general the governmental powers over these lands will not be relinquished. [Citation.] It is within this general framework that we are called upon to decide whether the legislative grant here was valid."). Regardless, nothing in *Scott* would lead us to find that the sale at issue violated the public trust doctrine, or that the admission of evidence of the Board's planned use of the proceeds of the sale was erroneous. To the contrary, under *Scott* the trial court appropriately considered how the funds from the sale would be used.

¶ 81    A relinquishment of land which was available for the use of the public may violate the public trust doctrine where the primary purpose of the transaction is to benefit a private interest. *Scott*, 66 Ill. 2d at 77-78. The *Scott* court found the argument that a public purpose would be served by the transfer involved therein, because the transfer would result in "commercial development" and "boost the economy," unpersuasive. *Id.* at 80. However,

nothing in the language of *Scott* suggests that relinquishing such property to provide a financial benefit to the public would be inappropriate. The *Scott* court's concern was not with whether pecuniary interests were involved, but whether the pecuniary benefit to the public was only incidental or "too indirect, intangible and elusive to satisfy the requirement of a public purpose." *Id.* at 80-81 ("In order to preserve meaning and vitality in the public trust doctrine *** the public purpose to be served cannot be only incidental and remote. The claimed benefit here to the public through additional employment and economic improvement is too indirect, intangible and elusive to satisfy the requirement of a public purpose.").

¶ 82    *Scott* cited with approval *People ex rel. Moloney v. Kirk*, 162 Ill. 138 (1896), as an example of the court upholding a grant of submerged land (again, the topic to which *Scott* is expressly limited) to private individuals. *Scott*, 66 Ill. 2d at 81. The *Scott* court found that in *Moloney*, the benefit to the *private interest* was incidental to the public purpose. *Id.* In *Moloney*, the sale of the submerged land was authorized to defray the costs of constructing an extension to Lake Shore Drive. The court held "that it was not illegal for the legislature to authorize the sale of the reclaimed land to defray the cost of the improvement." *Scott*, 66 Ill. 2d at 76 (citing *Moloney*, 162 Ill. at 151).

¶ 83    Although *Moloney* involved an express grant of authority to appropriate property for the purpose of defraying a cost (*Moloney*, 162 Ill. at 141-42), we find that under the public trust doctrine the planned use of funds from the sale of park land is relevant to the determination of whether the sale would be for the public interest, when considered in light of the other factors listed in the Act as to when such sale is in the public interest (*i.e.*, that the land is no longer needed or useful and the proceeds would be used for the use of the park). *Scott*, 66 Ill. 2d at 73-74 ("The control of the State for the purposes of the trust can never be lost, *except* as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." (Emphasis added and internal quotation marks omitted.)).

¶ 84    Further, the Act directs that if the trial court determines that the granting of the application is for the public interest it shall direct that the property be sold "for the use of said park." 70 ILCS 1235/1 (West 2008). Thus, evidence of the use of the proceeds is relevant under the plain language of the Act. The Park District's evidence with regard to using the funds from the sale for renovations to Gordon Park was directly related to the purposes of the Act and, therefore, admissible.

¶ 85                            C. Sufficiency of the Evidence

¶ 86    Objector argues the Park District failed to prove that the sale of the park land is in the public interest because of conflicting testimony and insufficient evidence as to (1) the value of Parcel 2 and Parcel 3 to the public relative to (2) the burden of maintaining those parcels and the problems they create. The Park District responds its evidence was sufficient to show that Parcel 2 and Parcel 3 lack utility and are no longer needed or necessary. The Park District also argues it presented a *further* rational basis for the proposed sale in that it plans to use the proceeds of the sale to redevelop Gordon Park and replenish its capital fund. The

Park District notes that the evidence was that the planned improvements resulted from public meetings to determine what the public would like to see in a redeveloped Gordon Park.

¶ 87         We must first determine the appropriate standard of review.

"[T]he determination of the appropriate standard of review turns primarily upon the type of question or issue presented for review. ***

When we review a lower tribunal's factual determinations, those determinations will not be reversed on appeal unless they are contrary to the manifest weight of the evidence. [Citation.] A factual finding is contrary to the manifest weight of the evidence when, upon a review of all the evidence in the light most favorable to the prevailing party, the opposite conclusion is clearly apparent or the fact finder's finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence." *United States Steel Corp. v. Illinois Pollution Control Board*, 384 Ill. App. 3d 457, 461 (2008).

¶ 88         Because the determination of whether to grant an application under the Act is based on a factual determination of whether the land at issue is needed, necessary or useful and its sale would be for the public interest, we will apply the manifest-weight-of-the-evidence standard of review. In ruling in favor of the Park District, the trial court found, in pertinent part, as follows:

"The testimony at trial showed that the baseball diamonds [in East Gordon Park] are frequently underwater, the tennis courts are no longer in great repair, the play lot is closed and there are no bathroom facilities other than one Porta toilet, limited lighting, no walking or running paths on the larger part of Gordon Park. As to the 2.88 acres, there are no amenities other than as previously mentioned. Testimony was that sight lines from the remainder of the park are very limited, functionality of these two parcels, Parcel 2 and 3 are very limited, soccer was playable only for the smallest children. The league chooses not–the AYSO league chooses not to use the space because of topographical limitations.

There was testimony from one jogger that he runs in this area, from another that it was inappropriate. That appears to be a matter of personal preference or perhaps individual abilities. However, from all the testimony it appears that this parcel of property is generally useful only for passive or for casual pick-up type activities. Indeed, it appears appropriate for very minimal usage and is totally lacking in utility or safety for many, many park district activities. The very lack of visibility makes this an area of concern for park usage.

It appears that the park district is seeking to sell this parcel and has made a determination that the sale would be a highest and best use of its resources; in other words, that it would maximize the benefit to the public by selling this clearly underutilized and underutilizable small parcel so that it can maximize its more usable space."

¶ 89         Viewing all of the evidence in the light most favorable to the Park District, the prevailing party in this case, we cannot say that the opposite conclusion is clearly apparent, the trial court's findings are palpably erroneous, or that the judgment is the result of passion or prejudice and not substantiated by the evidence.

-19-

¶ 90    The finding that the park land is no longer needed, necessary, or useful for purposes of the park is not against the manifest weight of the evidence. The Park District presented ample evidence that the land at issue provided little value to the public. The Park District no longer uses the maintenance buildings that occupy Parcel 2. There was some evidence of the use of the tennis courts and use of West Gordon Park by very youthful soccer players. However, the Park District presented evidence that a tennis court in Gordon Park would remain available after the sale of the land, as would facilities for young soccer players. Regardless, only a portion of the existing tennis courts are actually on the subject property. Thus, any plan to reduce the existing number of tennis courts would not necessarily be prevented by denying the application. Similarly, the various unorganized recreational activities that could occur on the subject property could also occur in the remainder of the park. Objector presented scant evidence of the public actually using Parcel 2 or Parcel 3 for any of its hypothetically possible recreational activities. Therefore, the opposite conclusion, that the land is "necessary" for purposes of the park, is not clearly apparent.

¶ 91    The evidence did not actually conflict on the difficulties in maintaining this portion of the park. Objector's witness only testified that with proper training, mowing Parcel 2 and Parcel 3 would not be more difficult than mowing flat park land. There was no evidence that the parties who actually mow the land have that training. Further, there was undisputed evidence that mowing this section of the park required more time than other similarly sized portions of the park that are flat.

¶ 92    Objector only provided evidence of limited uses by a small percentage of the public, which cannot lead us to conclude that the trial court's findings that the land is no longer needed, necessary or useful is wholly unwarranted. Objectors presented evidence that the subject property could be put to better use with an outlay of funds. The fact that the land could be made useful for purposes of the park only proves that the land is not currently useful for purposes of the park.

¶ 93    The finding that the sale is for the public interest is not against the manifest weight of the evidence. The benefits to the public are not incidental, indirect, intangible or elusive. Objector provided no contrary evidence to the Park District's evidence that the proposed renovations to Gordon Park resulted from public meetings and reflect the public will. The revenue generated will allow the Park District to enhance services to the public and improve public facilities by providing amenities the public wants. Although it has solicited bids to begin the renovation, the Park District presented evidence that it cannot complete the renovations without selling the land. As demonstrated, the sale of the land will not result in a significant diminution in the public's use and enjoyment of Gordon Park, if any at all. Therefore, the sale of the land bears a real and substantial relation to the general welfare, and is a rational means to accomplish a legitimate purpose.

¶ 94                                    CONCLUSION

¶ 95    The trial court had jurisdiction to hear the application because the application embraced less than 3 acres of park land. The Act is constitutional and does not violate the Separation of Powers clause of the Illinois Constitution. The court applied the correct standard of proof

to the application, committed no errors in receiving evidence at the trial on the application, and the court's decision on the application is not against the manifest weight of the evidence. The Park District's decision that the land was no longer needed, useful, or necessary and that its sale would be for the public interest was not arbitrary and capricious. The judgment of the trial court is, accordingly, affirmed.

¶ 96      Affirmed.