2020 IL App (4th) 190850

FILED
August 26, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| I-57 AND CURTIS, LLC, a Florida Limited Liability Company, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Champaign County |
| v. | ) | No. 18MR867 |
| THE URBANA AND CHAMPAIGN SANITARY DISTRICT, an Illinois Special District; THE CITY OF URBANA, an Illinois Body Politic and Corporate; THE CITY OF CHAMPAIGN, an Illinois Body Politic and Corporate; THE VILLAGE OF SAVOY, an Illinois Body Politic and Corporate; and THE VILLAGE OF BONDVILLE, an Illinois Body Politic and Corporate, | ) ) ) ) ) ) ) ) ) ) | Honorable Jason Matthew Bohm, Judge Presiding. |
| Defendants-Appellees. | | |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Knecht and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, I-57 and Curtis, LLC, a Florida limited liability company, brought this action against the Urbana and Champaign Sanitary District (Sanitary District), the City of Champaign, and other municipal defendants, seeking to invalidate an intergovernmental contract and some related ordinances. The contract, to which the Sanitary District and the municipal defendants are signatories, governs annexations of territory to the Sanitary District and (by virtue of such annexations) new connections to the sewer lines of the Sanitary District. Plaintiff considers itself to be wronged by the contract and related ordinances in essentially two ways. First, as the contract and an implementing ordinance require, the board of trustees of the Sanitary District

(Board) will allow plaintiff to annex its land to the Sanitary District and will allow plaintiff to connect to a sewer line of the Sanitary District only if plaintiff enters into a municipal annexation agreement with the City of Champaign—which plaintiff is unwilling to do because then the land would be subject to the City of Champaign's zoning regulations. Second, pursuant to an ordinance of its own, the City of Champaign will approve the development of plaintiff's land as a subdivision (which would require connection to the sewer line of the Sanitary District) only if plaintiff enters into a municipal annexation agreement with the City of Champaign.

¶ 2    Against this annexation leverage, the first amended complaint advances several legal theories. Plaintiff claims that the intergovernmental contract is statutorily unauthorized, if not positively forbidden by statutory law. Also, plaintiff claims that, by effectively stymieing the development of plaintiff's land, defendants have deprived plaintiff of a valuable property interest without the due process of law. Finally, plaintiff claims that "coerced annexation" violates plaintiff's constitutional right to freely and voluntarily choose whether and how to participate in the electoral process of municipal annexation. On those theories, the first amended complaint seeks declaratory relief, damages, attorney fees, and injunctive relief.

¶ 3    After answering the first amended complaint, defendants moved for a judgment on the pleadings. See 735 ILCS 5/2-615(e) (West 2018). The circuit court of Champaign County granted the motion. Plaintiff appeals.

¶ 4    We have reviewed *de novo* (see *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010)) the uncontroverted well-pleaded facts in the first amended complaint (see *Village of Worth v. Hahn*, 206 Ill. App. 3d 987, 990 (1990)), any fair and reasonable inferences that can be drawn from those facts (see *Wilson*, 237 Ill. 2d at 455), the exhibits attached to the first amended complaint (see *State Farm Fire & Casualty Co. v. Young*, 2012 IL App (1st) 103736, ¶ 11), the

matters subject to judicial notice (see *M.A.K. v. Rush-Presbyterian-St.-Luke's Medical Center*, 198 Ill. 2d 249, 255 (2001)), and the judicial admissions in the record (see *id.*). In our review, we find no genuine issue of material fact, and we conclude that defendants are entitled to a judgment as a matter of law. See *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005). Therefore, we affirm the judgment.

¶ 5                                    I. BACKGROUND

¶ 6        Boneyard Creek is about three miles long and runs through the cities of Champaign and Urbana, Illinois, before flowing into the Saline Branch drainage ditch, north of downtown Urbana. The creek drains the stormwater that runs off from Champaign and Urbana.

¶ 7        On January 31, 1949, the Sanitary District entered into an "indenture" (an archaic word for a contract) in which the Sanitary District agreed to assume full responsibility for Boneyard Creek. *In re Saline Branch Drainage District*, 172 Ill. App. 3d 574, 575 (1988). The parties to this contract—let us call it "the Boneyard Indenture"—were the Sanitary District, the Saline Branch Drainage District (Drainage District), the City of Urbana, and the City of Champaign. *Id.* In the Boneyard Indenture, they "recognized the jurisdiction of the Sanitary District over the Boneyard and its existing open tributaries, draining such lands, and over the rights-of-way, improvements, drains[,] and drainage structures in the Boneyard." *Id.*; see 70 ILCS 2405/7 (West 2018) (empowering the board of trustees of a sanitary district to "provide for the drainage of such district by laying out, establishing, constructing[,] and maintaining one or more channels *** for carrying off and disposing the drainage (including the sewage) of such district"). The Sanitary District agreed to accept " 'full and complete responsibility for the improvements and maintenance of the Boneyard and its existing open tributaries, and it [agreed] to provide and keep in repair an adequate system of storm water drainage therein and to correct any sanitary and

- 3 -

unhealthful conditions existing therein.' " *In re Saline*, 172 Ill. App. 3d at 575. The Drainage District, for its part, agreed that lands lying within the boundaries of both the Drainage District and the Sanitary District would be detached from the Drainage District and would cease to be included in it. *Id.* at 576.

¶ 8 On March 16, 1992, the Sanitary District entered into another contract, this one titled "Agreement *re* Boneyard Drainage District" (hereinafter, "Municipal Assumption Agreement"). The contracting parties were the Sanitary District, the City of Champaign, and the City of Urbana. In this contract, they acknowledged some persistent problems: pollutants still were getting into Boneyard Creek, and the creek still was unable to handle all the stormwater from Champaign and Urbana. Therefore, the City of Champaign and the City of Urbana wanted to take over the management of these problems. To that end, the Sanitary District assigned to the City of Champaign and the City of Urbana all of its rights and powers under the Boneyard Indenture, and the City of Champaign and the City of Urbana assumed all of the duties of the Sanitary District under the Boneyard Indenture. Within their respective geographical boundaries, the City of Champaign and the City of Urbana agreed to take over, from the Sanitary District, full responsibility for the improvement and maintenance of Boneyard Creek.

¶ 9 This municipal assumption of responsibility, however, was tied to another agreement, which the Sanitary District executed at the same time:

"This [Municipal Assumption] Agreement is being executed concurrently with the execution of a certain agreement entitled [']Agreement Concerning [S]anitary [S]ewers['] [(hereinafter, 'Sewer Agreement'),] which is being executed by the City of Champaign, City of Urbana, Village of Savoy, and [the] Sanitary District. If a court of competent jurisdiction declares that the [Sewer] [A]greement \*\*\*, or

any provision therein, is invalid or otherwise unenforceable in whole or in part, or declares this [Municipal Assumption] Agreement to be invalid or otherwise unenforceable in whole or in part, the obligations of the Parties to this [Municipal Assumption] Agreement shall forthwith cease and terminate at the date of the exhaustion of the last appeal from such declaration of invalidity or unenforceability."

(Later, the Village of Bondville joined in the Sewer Agreement.) Thus, if the Sewer Agreement were toppled in judicial proceedings, the Municipal Assumption Agreement would go down with it, and there would be a return to the *status quo ante*: the Sanitary District once again would be saddled with its obligations in the Boneyard Indenture.

¶ 10    The contractually indispensable Sewer Agreement was executed on March 16, 1992. Therein, the Sanitary District made the following promise (among others) to the City of Champaign and the City of Urbana, referred to as the "Municipalities":

"(b) New Sewer Connections. After the effective date of this [Sewer] Agreement, the [Sanitary] District shall not allow any new sanitary sewer service connections to Collector or Interceptor or District Approved Collector or Municipal Approved Collector Sewers to serve properties outside of the Municipalities unless the property to be served by such connection is the subject of a written annexation or development agreement with the Municipality in whose Annexation Boundary Limits the land to be served by the sewer lines, or the property is a lot within a legally recorded final plat which plat has been approved by a Municipality prior to the effective date of this Agreement."

That paragraph uses some technical terms. A "collector sewer" carries wastewater from a source to an "interceptor sewer," a larger sewer line that in turn carries the wastewater to the treatment plant. The term "Annexation Boundary Limits" means "the annexation boundaries agreed to by and between the Municipalities." Thus, the Sanitary District agreed as follows in the Sewer Agreement. From March 16, 1992, onward, the Sanitary District would not allow property outside the cities of Champaign or Urbana to connect to its collector or interceptor sewers unless either of two conditions were met: (1) the property was the subject of a written annexation agreement or development agreement with the municipality within whose annexation boundary limits the property was located or (2) when the Sewer Agreement was executed, the property already was a lot in a legally recorded final plat approved by the municipality.

¶ 11   On or about March 1, 2011, pursuant to section 11-12-6 of the Illinois Municipal Code (65 ILCS 5/11-12-6 (West 2010)), the City of Champaign adopted a comprehensive plan, the "Champaign Tomorrow Comprehensive Plan." Because of the City of Champaign's adoption of this comprehensive plan, section 11-12-5 of the Illinois Municipal Code (*id.* § 11-12-5) allowed the City of Champaign to exercise subdivision control (not to be confused with zoning control) over properties within one and a half miles outside its corporate boundaries, including plaintiff's property. The comprehensive plan contemplated the development of the area near the I-57 and Curtis Road interchange, of which plaintiff's property was a part.

¶ 12   In accordance with its comprehensive plan, the City of Champaign adopted subdivision regulations, Chapter 31 of the City of Champaign's municipal code (Champaign Municipal Code § 31-101 *et seq.* (adopted Mar. 5, 2002)). Section 31-111 of the subdivision regulations conditions subdivision plat approval on a municipal annexation agreement if the subdivision would connect to the sewer system of the Sanitary District:

"A final plat shall not be approved where the approved engineering plans provide for connection to any part of the sanitary sewer system of the City or the *** Sanitary District, unless the land is within the City, or the owner of the subdivision has submitted to the City a legally sufficient petition to annex, or the City and owner have executed an Annexation Agreement." Champaign Municipal Code § 31-111 (amended Oct. 7, 2003) (hereinafter Subdivision Ordinance).

In its first amended complaint, plaintiff observes that any plat of subdivision for the development of plaintiff's property necessarily would contemplate a connection to the sewer system of the Sanitary District. Consequently, before approving any final plat related to the property, the City of Champaign, pursuant to its Subdivision Ordinance, would require plaintiff to sign an agreement to annex the property to the City of Champaign. Plaintiff further notes, in the first amended complaint, that annexing the property to the City of Champaign would cause a substitution in the governing zoning regulations: whereas plaintiff's property now is subject to the zoning regulations of Champaign County, the property would become subject to the zoning regulations of the City of Champaign. (More precisely, we note, the execution and adoption of a municipal annexation agreement would immediately subject the property to the zoning regulations of the City of Champaign, regardless of whether the property ultimately were annexed. See 65 ILCS 5/11-15.1-1, 11-15.1-2.1(a) (West 2018).)

¶ 13    On December 12, 2012, to further strengthen the tie between Sanitary District annexation and municipal annexation, the Sanitary District adopted its own ordinance providing as follows:

"The [Sanitary] District shall not allow any new sanitary sewer service connections to Collector or Interceptor Sewers to serve properties outside the

corporate limits of one of the municipalities located within the [Sanitary] District, unless the property to be served by such connection is the subject of a written Annexation, or Development Agreement, with the Municipality in whose Annexation Boundary Limits the land to be served by the sewer [lines], or the property is a lot within a legally-recorded final Plat, which Plat had been approved by the Municipality prior to June 11, 1990." Urbana & Champaign Sanitary District Ordinance No. 678, § 210 (adopted Dec. 6, 2012) (hereinafter Sanitary District Ordinance).

See also 70 ILCS 2405/4 (West 2010) (empowering the board of trustees of a sanitary district to "pass all necessary ordinances *** for the proper management and conduct of the business of the board and the corporation, and for carrying into effect the objects for which the sanitary district was formed").

Thus, both the City of Champaign and the Sanitary District have adopted ordinances calculated to give their Sewer Agreement the force of law.

¶ 14        On June 19, 2018, Peter Creighton, plaintiff's managing director, petitioned the Board of the Sanitary District to annex to the Sanitary District the land in question: about 99.136 acres at the northeast quadrant of Interstate 57 and Curtis Road, in unincorporated Champaign County. See 70 ILCS 2405/23.4 (West 2018). Because the land was larger than 60 acres and was not "wholly bounded" in the manner described by section 7-1-13 of the Illinois Municipal Code (65 ILCS 5/7-1-13 (West 2018)), the land was ineligible for unilateral annexation to the City of Champaign, that is, annexation by the City of Champaign without plaintiff's consent. But, notwithstanding the unfulfilled conditions of section 7-1-13, the land could be annexed to the City of Champaign *by agreement*. See *id.* § 11-15.1-1.

¶ 15     The Sanitary District put plaintiff's petition on the agenda for the board meeting scheduled for July 5, 2018. In that meeting, the proposed annexation of plaintiff's property to the Sanitary District was discussed. It appears, however, from the minutes of the meeting, that the Board neither approved nor denied plaintiff's petition.

¶ 16     On July 18, 2018, the executive director of the Sanitary District, Rick Manner, sent an e-mail to plaintiff's engineer, Chris Billing, the vice president of Berns, Clancy and Associates, P.C. In the e-mail, Manner advised Billing that the lack of annexation to the City of Champaign prevented the property from being developed with sewer service provided by the Sanitary District.

¶ 17     Later that same day, counsel for plaintiff, Patrick T. Fitzgerald, e-mailed counsel for the Sanitary District, Mike McCormick, asking: "Is Peter Creighton's entering into an annexation agreement with the City of Champaign a condition precedent to his annexing to the [Sanitary District], accessing sanitary sewer service[,] or both?" McCormick replied:

> "Our concern is that Mr. Creighton understand and agree that no service can be provided and no connection can be made until a development agreement or an annexation agreement with the City is entered into. I don't think there is a problem with annexing so long as we are in agreement relating the property not being able to connect until such an agreement with the City is established. I thought we might enter into a very short annexation agreement memorializing this."

¶ 18     Also on July 18, 2018, McCormick e-mailed Billing as follows:

> "There is an outstanding issue regarding annexation into [the Sanitary District]. We have been in contact with Mr. Creighton's attorney, Pat Fitzgerald. We have been waiting some feedback regarding Mr. Creighton's willingness to annex into the City of Champaign.

While Mr. Creighton has petitioned to annex into [the Sanitary District], my understanding is that he has not made any arrangements to annex into the City of Champaign. If [Berns, Clancy and Associates, P.C.,] has been involved in anything to facilitate that annexation, please let us know[,] as that could restart the process for [the Sanitary District's] annexation.

As you are probably aware, the [Sewer] Agreement *** contains a prohibition of [the Sanitary District's] issuing connection permits or extending sewers without an annexation or development agreement approved by the City. So[,] the lack of annexation into the City is a serious concern that would prevent development of the site with sewers and thereby what is possible for the site."

¶ 19    On August 30, 2018, Manner wrote a memorandum to the Board of the Sanitary District regarding the petitioned-for annexation of the land to the Sanitary District. It was Manner's understanding that Creighton, "the property owner," "was not at all interested in annexing into the City of Champaign," even though the Sewer Agreement "prevented [the Sanitary District] from approving sewer extensions or connections to many unincorporated subdivisions." Manner had conferred with the Board's counsel, McCormick, who had explained to Manner that, although most annexations to the Sanitary District went forward without question, the Board "still ha[d] a choice regarding annexations." In McCormick's opinion, the Board had "complete freedom to either annex, or not, based upon what the Board fe[lt] [was] in the best interest of the [Sanitary District]." For example, "the Board ha[d] the option to reject annexing any parcel that [did not] already conform to the [Sewer] Agreement." After talking with McCormick, Manner had "confirmed with the Board that[,] if the [Sewer] Agreement's restrictions were somehow removed, *** there was general concurrence that staff should intend to follow the [Sewer] Agreement's restrictions,

- 10 -

regardless of the legal standing of the agreement itself." In other words, even if, for whatever reason, the Sewer Agreement were not legally binding on the Board, the Board was of the view that the Sewer Agreement was good policy that still should be followed.

¶ 20 After informing the Board of Creighton's objection to submitting the land to the jurisdiction of the City of Champaign, Manner suggested that "[n]o action [was] required" of the Board at this time. Instead, he passed along McCormick's recommendation that the staff negotiate a sewer annexation agreement with Creighton:

> "With these unique facts surrounding this request, Mike McCormick feels it is prudent to negotiate an Annexation Agreement for this parcel with the owner. The Annexation Agreement will explicitly review the development restrictions in the [Sewer] Agreement and obtain a commitment that the owner will annex into Champaign before requesting sewer service from [the Sanitary District]. This will also allow [the Sanitary District] staff to proceed with the annexation, giving everybody a path forward to turn this into a normal development. Staff agrees with this approach.
>
>      ***
>
> There will be no need for action by the Board until a draft Annexation Agreement is written and available for consideration—this will not occur until the October Board Meeting or later."

¶ 21 Afterward, the Sanitary District tendered to plaintiff a proposed annexation agreement between plaintiff and the Sanitary District. Therein, plaintiff would agree, among other things, "not to make an application to connect to sanitary sewer until an annexation agreement or

development agreement with the City of Champaign ha[d] been signed and approved." Also, in the proposed agreement, plaintiff would acknowledge that,

> "pursuant to the [Sewer] Agreement, the Sanitary District shall not connect the Property to sanitary sewer nor will the Sanitary District provide sanitary sewer services to the Property until such time as Plaintiff has entered into an Annexation Agreement or a Development Agreement with the City of Champaign as contemplated by the [Sewer] Agreement."

(We quote here from the first amended complaint.)

¶ 22　　According to the first amended complaint, "[p]laintiff negotiated in good faith to voluntarily annex into the City of Champaign for two years, despite that [p]laintiff [was] not required by law to do so." But "[t]he City of Champaign unilaterally ended the negotiations with [p]laintiff, thereby eliminating [p]laintiff's ability to voluntarily annex into the City of Champaign."

¶ 23　　To substantiate that allegation, plaintiff has attached to the first amended complaint an e-mail of January 10, 2018, from Robert Kowalski, the assistant director of the Planning and Development Department of the City of Champaign, to Fitzgerald and Creighton. The e-mail from Kowalski reads as follows: "I should have added in my previous emails that it is the consensus of our Staff that this draft agreement is as far as Staff can go in supporting flexibility from existing regulations/practices—especially as it pertains to access and zoning. We can support processing this agreement but cannot support further negotiating the terms. Thank you." (The draft agreement to which Kowalski refers does not appear to be attached to, or substantively described in, the first amended complaint. Apparently, it was a proposed agreement drafted by the City of Champaign, as distinct from the proposed agreement drafted by the Sanitary District. That is to say, there was

a proposed municipal annexation agreement, as well as a proposed agreement for annexation to the Sanitary District.) Plaintiff alleges: "Since the January 10, 2018[,] e[-]mail, no further negotiations between [p]laintiff and the City of Champaign have taken place."

¶ 24    Not only that, but "[t]he Sanitary District refused to take further action on [p]laintiff's request for annexation into the Sanitary District without [p]laintiff['s] entering into an agreement with the City of Champaign." It seems, then, that plaintiff and the City of Champaign are at an impasse—and that plaintiff and the Sanitary District, therefore, are at an impasse.

¶ 25    By this litigation, plaintiff seeks to break the impasse. Count I of the first amended complaint seeks a declaratory judgment against defendants that the Sewer Agreement is "invalid and unenforceable insofar as it prohibits any new connection prior to an annexation, an annexation agreement, or a development agreement with a municipality."

¶ 26    Count II seeks a declaratory judgment against two of the defendants, the City of Champaign and the Sanitary District, that the Sewer Agreement is, to repeat the language from count I, "invalid and unenforceable insofar as it prohibits any new connection prior to annexation, an annexation agreement, or a development agreement with a municipality."

¶ 27    Count III seeks a declaratory judgment against the Sanitary District that the Sanitary District Ordinance "is invalid and unenforceable insofar as it conflicts with the Sanitary District Act of 1917 [(Sanitary Act) (70 ILCS 2405/0.1 *et seq.* (West 2018))] and constitutes an unauthorized transfer of the Sanitary District's power to select who can connect to the Sanitary District's sewers to the City of Champaign because it prohibits any new connection prior to annexation, an annexation agreement, or a development agreement with a municipality."

¶ 28    Count IV seeks a declaratory judgment against the City of Champaign that "the Subdivision Ordinance [is] invalid and unenforceable in so far as it requires annexation, an

annexation agreement, or a development agreement with a municipality prior to final plat approval of any plat where the approved engineering plans provide for connection to any part of the sanitary sewer system of the City of Champaign or the Sanitary District."

¶ 29    Count V seeks a declaratory judgment against the City of Champaign and the Sanitary District that the Sewer Agreement, the Sanitary District Ordinance, and the Subdivision Ordinance are "invalid and unenforceable in so far as they, individually and collectively, improperly coerce [p]laintiff to annex into the City of Champaign or enter into an annexation or a development agreement with the City of Champaign in order to receive sanitary service."

¶ 30    On a theory of "substantive due process," count VI seeks from the City of Champaign and the Sanitary District compensatory damages, punitive damages, and attorney fees. Also, this count seeks "an order permanently enjoining the [d]efendants from requiring annexation, an annexation agreement or final plat approval which is contingent on annexation prior to approval of connection to the Sanitary District's sewers."

¶ 31    Count VII seeks "an order permanently enjoining [d]efendants from conditioning any sewer connection with the Sanitary District, including those tributary to the Sanitary District, upon annexation, an annexation agreement[,] or development agreement with the City of Champaign or the other municipal [d]efendants, and for such other relief as the court deems appropriate."

¶ 32                                II. ANALYSIS

¶ 33        A. The Power of the Contracting Parties to Enter Into the Sewer Agreement

¶ 34    Plaintiff claims that the Sewer Agreement is illegal under section 3 of the Intergovernmental Cooperation Act (5 ILCS 220/3 (West 2018)), which provides as follows: "Any power or powers, privileges, functions, or authority exercised or which may be exercised by a

public agency of this State may be exercised, combined, transferred, and enjoyed jointly with any other public agency of this State *** except where specifically and expressly prohibited by law." By plaintiff's reasoning, because the Sewer Agreement prohibits any new sewer connection permits for unincorporated land prior to the forging of an annexation agreement between the landowner and the municipality, the Sewer Agreement effectively transfers to the municipality the power to rule on petitions for annexation to the Sanitary District—a power that section 23.4 of the Sanitary Act (70 ILCS 2405/23.4 (West 2018)) bestows only upon the Board of the Sanitary District. Such a transfer of power, plaintiff argues, is unauthorized by section 3 of the Intergovernmental Cooperation Act, which allows power to be transferred from one unit of local government to another only on condition that the transfer is not "specifically and expressly prohibited by law." 5 ILCS 220/3 (West 2018).

¶ 35        Contrary to plaintiff's contention, the Sewer Agreement transfers no power from the Sanitary District to the City of Champaign. The Board of the Sanitary District retains its statutory power to approve or deny plaintiff's petition for the annexation of territory to the Sanitary District. See 70 ILCS 2405/23.4 (West 2018). The City of Champaign cannot exercise that power.

¶ 36        Granted, the Sewer Agreement contractually bars the Board from approving plaintiff's petition unless plaintiff and the City of Champaign agree to the annexation of plaintiff's land to the City of Champaign. It takes two, however, to make such an agreement—the City of Champaign and plaintiff—and plaintiff can stymie the contractual negotiations just as the City of Champaign can. And yet plaintiff does not contend that the Board has transferred its power to *plaintiff*. The Board has transferred its power to no one. By making its decision partly contingent on the contractual negotiations between plaintiff and the City of Champaign, the Board has not relinquished its power under section 23.4 (*id.*) to vote aye or nay on plaintiff's petition. Regardless

of the reasons or constraints that will drive the voting, it still will be the Board that votes, not the City of Champaign. And even if plaintiff and the City of Champaign succeed in concluding a municipal annexation agreement, the Board may nevertheless deny plaintiff's petition for other reasons. The Board retains its power under section 23.4. No one but the Board members will vote on plaintiff's petition.

¶ 37        This is not to deny that the Sanitary District and the City of Champaign have entered into an intergovernmental contract that can force the Board's hand when it considers a petition for annexation to the Sanitary District. See 5 ILCS 220/5 (West 2018) (intergovernmental contracts). But a forcing of the hand is what contracts are all about. See *Polytechnical Consultants v. Lind Plastic Products, Inc.*, 82 Ill. App. 3d 472, 474 (1980) (defining a contract as "an agreement between competent parties, based upon sufficient consideration, to do or to refrain from doing a particular thing [citation], for the breach of which the law gives a remedy"). Through an intergovernmental contract, one unit of local government, *A*, can bind another unit of local government, *B*, to exercise *B*'s statutory power in a certain way even though *A* itself lacks the statutory power that *B* binds itself to exercise in a certain way. For an illustration of this truth, we need look no further than a case that plaintiff cites, *Rajterowski v. City of Sycamore*, 405 Ill. App. 3d 1086 (2010).

¶ 38        Here are the facts in *Rajterowski*. A referendum was passed authorizing the City of Sycamore, Illinois, a home rule municipality, to impose a tax on real property transferred within its municipal boundaries. *Id.* at 1090. Accordingly, the city adopted an ordinance establishing the transfer tax. *Id.* The purpose of the ordinance was to create a new source of funding for Sycamore Community Unit School District No. 427. *Id.* An intergovernmental contract between the city and

the school district described how the transfer-tax revenues, minus the city's administrative expenses, would be calculated and provided to the school district. *Id.*

¶ 39 The plaintiffs in *Rajterowski* were home buyers in the city who had incurred the transfer tax. *Id.* at 1091. Count V of their complaint challenged the school district's authority to enter into an intergovernmental contract whereby the city would collect a transfer tax and give the tax revenues to the school district. *Id.* at 1118. In support of their claim that the circuit court had erred by dismissing count V as legally insufficient (see *id.* at 1091), the plaintiffs made the following argument to the appellate court. Under section 17-2 of the School Code (105 ILCS 5/17-2 (West 2008)), the school district had authority to levy only *ad valorem* (translated as "according to value") taxes on real property. *Rajterowski*, 405 Ill. App. 3d at 1118. Therefore, the plaintiffs argued, the school district, a non-home-rule entity, lacked the statutory authority to impose a transfer tax, *either directly or through the city*, or to receive transfer tax revenues from the city. *Id.* at 1119.

¶ 40 Much like plaintiffs in the present case, the plaintiffs in *Rajterowski* sprinkled their argument with citations to Attorney General opinions to the effect that "non-home-rule entities may not, by entering into intergovernmental agreements, circumvent statutory requirements or limitations." *Id.* Or, as one Attorney General opinion put it: " '[T]he Intergovernmental Cooperation section of the Constitution [(Ill. Const. 1970, art. VII, § 10)] and its statutory counterpart, the Intergovernmental Cooperation Act [(5 ILCS 220/1 *et seq.* (West 2004))], are not grants of authority to undertake jointly functions that the cooperating entities cannot undertake individually.' " *Rajterowski*, 405 Ill. App. 3d at 1119 (quoting 2005 Ill. Att'y Gen. Op. No. 05-010, https://illinoisattorneygeneral.gov/opinions/2005/05-010.pdf [https://perma.cc/M39P-X2GP]).

¶ 41    The appellate court found the Attorney General opinions to be well-reasoned (*id.* at 1120) but inapposite (see *id.* at 1123). While it was true that the school district lacked authority to impose a transfer tax, it was the city and not the school district that imposed the transfer tax— and it was undisputed that the city could impose a transfer tax. See *id.* at 1123. Thus, no statutory limitation was circumvented. See *id.* The city, as opposed to the school district, had the constitutional and statutory authority to impose the transfer tax. *Id.* at 1092-93. And none of the School Code provisions upon which the plaintiffs relied forbade a school district to receive transfer tax revenues from the city. *Id.* at 1123.

¶ 42    Likewise, in the present case, plaintiffs fail to identify any statutory requirement or limitation that the Sewer Agreement circumvents. Specifically, plaintiffs fail to identify any power the contracting parties are expected to exercise under the Sewer Agreement that they would lack the authority to exercise apart from the Sewer Agreement. This point is driven home by the consensus of the Board of the Sanitary District that the Sewer Agreement should continue to be followed even if it were judicially invalidated. The Board of the Sanitary District has the statutory power to approve or deny petitions for annexation to the Sanitary District, and the Board, freely and on its own initiative, can make the presence or absence of a municipal annexation agreement the deciding factor. See 70 ILCS 2405/23.4 (West 2018). "Any *** powers, *** functions, or authority *** which may be exercised by a public agency of this State may be exercised, combined, *** and enjoyed jointly with any other public agency of this State *** except where specifically and expressly prohibited by law." 5 ILCS 220/3 (West 2018); see also Ill. Const. 1970, art. VII, § 10(a) (providing that "[u]nits of local government *** may contract *** among themselves *** to exercise *** any power or function, in any manner not prohibited by law or by ordinance"). We are unaware of any law "specifically and expressly prohibit[ing]" the Board of the Sanitary District

- 18 -

from conditioning its approval of a petition for annexation to the Sanitary District upon the petitioner's entering into a municipal annexation agreement, as the Sewer Agreement requires. 5 ILCS 220/3 (West 2018). The Board will exercise its statutory power in a certain way, as it agreed to do in its intergovernmental contract with the City of Champaign and the City of Urbana, just as Sycamore exercised its statutory power in a certain way, as it agreed to do in its intergovernmental contract with the school district. That does not mean that the City of Champaign itself will vote on plaintiff's petition for annexation to the Sanitary District any more than the school district itself imposed the transfer tax. Therefore, on the authority of *Rajterowski*, 405 Ill. App. 3d at 1123, we reject plaintiff's challenge to the validity of the Sewer Agreement.

¶ 43    B. The Board's Power to Require Plaintiff to Enter Into an Annexation Agreement With the City of Champaign as a Condition of Granting Plaintiff's Petition for Annexation to the Sanitary District

¶ 44        The Sanitary District, plaintiff observes, is not a home rule unit of government. See Ill. Const. 1970, art. VII, § 6. Therefore, the Sanitary District "may exercise only those powers granted to [it] by the constitution or by statute, together with such implied powers as are essential, not merely convenient, to carry out their express powers." *Rajterowski*, 405 Ill. App. 3d at 1121. Special districts, such as the Sanitary District, "are creations of the legislature *** and their powers are not to be enlarged by construction." (Internal quotation marks omitted.) *Baker v. Forest Preserve District of Cook County*, 2015 IL App (1st) 141157, ¶ 39. Plaintiff asserts that the Sanitary District lacks "express authority anywhere in its enacting statutes to withhold services based upon the jurisdiction, whether county or municipal, of the property to be served."

¶ 45        We disagree. The express authority is in section 17 of the Sanitary Act, which provides as follows: "Any district formed hereunder shall have the right to permit territory lying outside its limits *** to drain into and use any channel or drain made by it, *upon such *** terms*

- 19 -

*and conditions as may be mutually agreed upon \*\*\*.*" (Emphasis added.) 70 ILCS 2405/17 (West 2018). Section 17 places no limits upon the terms or conditions for connection to the sanitary district.

¶ 46       Nor does section 23.4 of the Sanitary Act prescribe or limit any conditions on the denial of a petition for annexation to the Sanitary District:

"§ 23.4. Any territory which is not within the corporate limits of any sanitary district but which is contiguous to a sanitary district and which territory has no electors residing therein; or any such territory with electors residing thereon; may be annexed to the sanitary district in the following manner: a written petition signed by the owners of record of all land within such territory, or if such territory is occupied, by the owners of record and by all electors residing thereon, shall be filed with the clerk of the sanitary district, which petition shall request annexation and shall state that no electors reside thereon (or that all such electors residing thereon join in the petition, whichever shall be the case) and shall be under oath. The board of trustees of the sanitary district to which annexation is sought shall then consider the question of the annexation of the described territory. A two-thirds vote of the board of trustees is required to annex. A copy of the ordinance annexing the territory together with an accurate map of the annexed territory, certified as correct by the Clerk of the District, shall be filed with the County Clerk of the county in which the annexed territory is located." *Id.* § 23.4.

¶ 47       Thus, section 23.4 specifies conditions in which territory *may* be annexed to the sanitary district, as follows: the territory is contiguous to the sanitary district and a sworn petition for annexation signed by all the owners of the territory and the resident electors, if any, has been

filed with the clerk of the sanitary district. *Id.* Other than those minimal conditions for *considering* the question of annexing the territory to the sanitary district, section 23.4 leaves the discretion of the board of trustees untrammeled. See *Krautsack v. Anderson*, 223 Ill. 2d 541, 554 (2006) (remarking that "the word 'may' ordinarily connotes discretion"). (At some places in the record, there is a discussion of annexation to the Sanitary District, and at other places in the record, there is a discussion of being allowed to connect to the sewer. By our understanding, annexation to the Sanitary District is a precondition of being allowed to connect to the interceptor sewer of the Sanitary District. Even after annexation, the landowner still must meet the technical requirements for connection, whereupon the landowner is issued a connection permit.) Section 23.4 has nothing to say about when the Board must approve a petition for annexation to the Sanitary District and when the Board must deny the petition. It is entirely up to the Board—which, therefore, may rationally decide that a certain class of petitions should be, in the best interest of the public, denied. Once the conditions for consideration of the petition are met, there are no statutory curbs on the Board's discretion. See 70 ILCS 2405/23.4 (West 2018). From that point on, the text of section 23.4 is wide open.

¶ 48        A case that plaintiff cites reminds us that "[a] court may not add provisions that are not found in a statute, nor may it depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express." (Internal quotation marks omitted.) *Baker*, 2015 IL App (1st) 141157, ¶ 39. Section 23.4 places no exception, limitation, or condition on the power of the board of trustees to deny a petition for annexation to the sanitary district. Nowhere does section 23.4 say that the Board is forbidden to deny the petition on the ground that the territory is outside the boundaries of a municipality. Instead, once the minimal conditions in section 23.4 are met, that section gives the Board the absolute discretion to

approve or deny a petition for annexation to the sanitary district—for any reason that seems fitting to the Board. See 70 ILCS 2405/23.4 (West 2018).

¶ 49        Looking beyond section 23.4, we find no statutory provision that limits or qualifies this absolute discretion. Section 7-1-13 of the Illinois Municipal Code (65 ILCS 5/7-1-13 (West 2018)) does not do so. Essentially, all that section says is that unincorporated territory containing 60 acres or less that is "wholly bounded" as described in that section "*may* be annexed by any municipality by which it is bounded in whole or in part, by the passage of an ordinance to that effect after notice is given." (Emphasis added.) *Id.* Section 7-1-13 has nothing to say, however, about annexing territory to a sanitary district. See *id.*

¶ 50        In sum, then, we reject plaintiff's claim that the Board of the Sanitary District lacks statutory power to condition the approval of plaintiff's petition for annexation to the Sanitary District on plaintiff's entering into a municipal annexation agreement with the City of Champaign. Once the prerequisites for consideration are met, section 23.4 gives the Board the unqualified discretionary power to approve or deny plaintiff's petition.

¶ 51        Plaintiff might think that the Sewer Agreement is unfairly coercive to developers and ill-advised as public policy. But the *reason* for denying a petition is not to be confused with the *power* to deny the petition. "[T]he power to decide carries with it the power to decide wrong[ly] as well as to decide right[ly]." (Internal quotation marks omitted.) *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 532 (2001). In its open-ended statutory discretion (see 70 ILCS 2405/23.4 (West 2018)), the Board of the Sanitary District has the *power* to refuse the annexation of unincorporated territory to the Sanitary District unless the territory is the subject of an annexation agreement with the City of Urbana or the City of Champaign.

¶ 52        C. An Alleged Subterfuge or Circumvention of Section 7-1-13

¶ 53 Plaintiff contends that, by "[b]locking access to the Sanitary District sewer unless the [p]laintiff annexes the [p]roperty into the City of Champaign," defendants perpetrate "a mere subterfuge to allow the City of Champaign to force annexation" in circumvention of section 7-1-13 of the Illinois Municipal Code (65 ILCS 5/7-1-13 (West 2018)). Plaintiff quotes from *Chicago Title Land Trust Co. v. County of Will*, 2018 IL App (3d) 160713, ¶ 34: "[C]ourts have scrutinized the sometimes creative attempts of municipalities to annex property, particularly where th[o]se attempts are merely a subterfuge to reach outlying areas." (Internal quotation marks omitted.)

¶ 54 A "subterfuge," though, is a "deception by artifice or stratagem in order to conceal, escape, or evade." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/subterfuge (last visited Aug. 18, 2020) [https://perma.cc/XD9M-UN7Z]. We do not see how the present case involved any deception. In their correspondence with plaintiff, the City of Champaign and the Sanitary District never gave any reasons that were pretextual. Annexation (or connection) to the Sanitary District was stalled because of the lack of a municipal annexation agreement. Subdivision approval was stalled for the same reason. There was no different reason that the stated reason concealed.

¶ 55 By contrast, in *Chicago Title*, 2018 IL App (3d) 160713, ¶ 42, the appellate court found deception. The village in that case talked Commonwealth Edison (ComEd) into voluntarily annexing its land to the village so that other properties would become contiguous to the village, thereby enabling the village to annex those other properties unilaterally. *Id.* ¶¶ 6-7. The majority in *Chicago Title* found some "unusual" and "curious" features in the annexation agreement between the village and ComEd. *Id.* ¶ 39. The village promised, for example, not to tax ComEd and not to enforce its zoning requirements and other regulations against ComEd. *Id.* Also, the village promised to allow ComEd to disconnect from the village within one year or even within

six months if the annexation of the other property fell through. *Id.* The majority concluded that the voluntary annexation of ComEd's property was "a sham transaction," a trick, and a counterfeit transaction that was practically devoid of substance. *Id.* ¶ 42. It was a subterfuge having no purpose other than to enable the village to reach the other property. *Id.* Consequently, the majority in *Chicago Title* chose to "ignore this sham transaction and conclude[d] that the [other] property was not 'wholly bounded' by one more or more municipalities, as required by section 7-1-13 of the [Illinois] Municipal Code [(65 ILCS 5/7-1-13 (West 2016))]." *Chicago Title*, 2018 IL App (3d) 160713, ¶ 42. It followed that the village lacked statutory authority to unilaterally annex the other property, or so the majority held. *Id.*

¶ 56        Justice Holdridge dissented. He argued that, in assessing the validity of an annexation, the reviewing court's sole concern should be whether the procedures in the Illinois Municipal Code were followed. *Id.* ¶ 52 (Holdridge, J., dissenting). If the landowner submitted to the annexation knowingly and voluntarily, it was, in Justice Holdridge's view, "of no legal significance" that the municipality had "instigated or encouraged" the landowner to submit to the annexation. *Id.* ¶ 55. The promises the village had made in the annexation agreement with ComEd were explicitly authorized by statutory law. *Id.* ¶ 56. Far from engaging in "trickery, manipulation, fraud, concealment, or subterfuge," the village had "acted transparently and [had] complied with all applicable statutory requirements." *Id.* ¶ 58.

¶ 57        Assuming that the majority in *Chicago Title* was right—assuming that the village in that case had engaged in deception or subterfuge to circumvent section 7-1-13 of the Illinois Municipal Code—the present case is different. We see no subterfuge by the Sanitary District and the City of Champaign to circumvent section 7-1-13 (65 ILCS 5/7-1-13 (West 2018)). Notwithstanding the requirements that section 7-1-13 imposes for *unilateral* annexation, *any* "land

in unincorporated territory," contiguous or not, can be the subject of an *annexation agreement* between the record owners of the land and a municipality. *Id.* § 11-15.1-1. Using section 11-15.1-1 is not a circumvention of section 7-1-13.

¶ 58        Plaintiff argues, however, that, if plaintiff entered into a municipal annexation agreement with the City of Champaign on pain of being denied access to the sewer system of the Sanitary District—access that would be indispensable to developing the property—the annexation agreement would not be truly voluntary. Instead, the annexation would be, in plaintiff's view, a "force[d] annexation of the [p]roperty in violation of [section] 7-1-13." But if a landowner and a municipality proceed under section 11-15.1-1, section 7-1-13 is inapplicable. Being inapplicable, section 7-1-13 could not be circumvented. And as for section 11-15.1-1, it has nothing to say about "forced annexations."

¶ 59        Again, we must not "depart from a statute's plain language by reading into [it] exceptions, limitations, or conditions" that lack a basis in the statutory text. (Internal quotation marks omitted.) *Baker*, 2015 IL App (1st) 141157, ¶ 39. Section 11-15.1-1 provides that "[t]he corporate authorities of any municipality may enter into an annexation agreement with one or more of the owners of record of land in unincorporated territory"—period. 65 ILCS 5/11-15.1-1 (West 2018). The statute does not condition that authority on the agreement's being unmotivated by economic incentives or annexation leverage. As Justice Holdridge notes in his dissent in *Chicago Title*, "[t]he intentions of the parties to an annexation agreement (*i.e.*, a municipality's reasons for encouraging the annexation and a landowner's reasons for filing an annexation petition) *are legally irrelevant*." (Emphasis in original.) *Chicago Title*, 2018 IL App (3d) 160713, ¶ 55 (Holdridge, J., dissenting). He is right.

¶ 60    To be sure, in a case on which plaintiff relies, *Austin Bank of Chicago v. Village of Barrington Hills*, 396 Ill. App. 3d 1 (2009), the courts took account of the municipality's reason for retaining two narrow strips of land on its eastern boundary when granting a disconnection. The true reason—an impermissible one, the appellate court agreed—was to prevent a further disconnection of territory. But the disconnection statute, section 7-3-6 of the Illinois Municipal Code (65 ILCS 5/7-3-6 (West 2006)) drove the analysis in *Austin Bank*, whereas the present case has nothing to do with the disconnection statute.

¶ 61    In *Austin Bank*, there were two petitions for the disconnection of territory from the village: an initial petition to disconnect 45 acres and a subsequent petition to disconnect 145 acres. In the first petition, a developer petitioned for the disconnection of a 45-acre parcel from the village. *Austin Bank*, 396 Ill. App. 3d at 2. The village granted the requested disconnection by passing an ordinance—except that the ordinance retained, within the village's jurisdiction, two narrow " 'barrier parcels,' " as the parties to the litigation called them. *Id.* In the circuit court, the village insisted that its reason for retaining these two strips of land was stormwater management. *Id.* at 4. The circuit court was unconvinced. It found that the real reason why the village had retained the barrier parcels was to prevent a disconnection of a 145-acre tract farther to the west, beyond the barrier parcels. *Id.* at 6. Under the disconnection statute, disconnection of territory was impermissible if it would cause one part of the municipality to become isolated from another part of the municipality. See 65 ILCS 5/7-3-6(3) (West 2006). Thanks to the village's retention of the barrier parcels, disconnection of the 145 acres farther to the west would have been, under the black-and-white terms of section 7-3-6(3), impermissible because such a disconnection would have left the barrier parcels isolated from the rest of the village.

¶ 62    Even so, a bank petitioned for the disconnection of the 145 acres, characterizing the village's decision to retain jurisdiction over the barrier parcels as " 'arbitrary, capricious, and a sham.' " *Austin Bank*, 396 Ill. App. 3d at 5. The circuit court agreed with that characterization: the retention of the barrier parcels was " 'a sham or subterfuge' " by the village to prevent the disconnection of the 145 acres to the west. *Id.* at 6. Therefore, declining to recognize the barrier parcels, the circuit court granted the bank's petition to disconnect the 145 acres. *Id.* The village appealed. *Id.*

¶ 63    The appellate court acknowledged that "disconnection of the subject property would isolate the barrier parcels." *Id.* at 9. The disconnection statute clearly stipulated that disconnecting territory from a municipality was allowed only if the disconnection would "not result in the isolation of any part of the municipality from the remainder of the municipality." 65 ILCS 5/7-3-6(3) (West 2006). Nevertheless, the appellate court reasoned, if "a literal interpretation of a particular clause would defeat the [legislature's] obvious intent" and inflict a "great injustice" that the legislature could not possibly have contemplated, the statute should not be interpreted (or applied) according to its literal terms. (Internal quotation marks omitted.) *Austin Bank*, 396 Ill. App. 3d at 9. "The legislature intended section 7-3-6 to liberally permit disconnection absent a hardship or impairment to the municipality." (Internal quotation marks omitted.) *Id.* The appellate court deferred to the circuit court's factual finding that "the isolation of the barrier parcels was the result of a legal gimmick by the [v]illage to improperly defeat [the bank's] disconnection petition." *Id.* at 14. Countenancing such a gimmick would have been inconsistent with a liberal construction of section 7-3-6. See *id.* at 9-10. Not only that, but the village was unable to show any hardship or impairment that would result from the disconnection of the 145 acres. *Id.* at 13. Therefore, the appellate court affirmed the circuit court's judgment in the bank's favor. *Id.* at 14.

¶ 64    For two reasons, we are unconvinced that *Austin Bank* would justify a reversal of the circuit court's judgment in the present case.

¶ 65    First, whereas the village in *Austin Bank* had engaged in a sham or subterfuge, defendants in the present case are innocent of any such wrongdoing. As far as we can see, they have never misrepresented their reasons or intentions. They have been up front about their objectives. Plaintiff argues in its brief: "The City of Champaign expressly acknowledges that it desires to zone and tax the Property, and Sanitary District services will be withheld to further that objective. [Citation.] This is a transparent and unlawful attempt to conduct an end run around the prohibition on extraterritorial zoning ***." Thus, the City of Champaign expressly and transparently acknowledges its objectives of zoning and taxing plaintiff's land. Also, the City of Champaign expressly and transparently acknowledges its use of the annexation leverage in its Subdivision Ordinance to achieve those objectives. Whatever criticisms could be leveled against the City of Champaign, pretense or deceit would not be among them.

¶ 66    Second, in *Austin Bank*, the appellate court rejected a " 'black-and-white' or literal interpretation of the statute." *Id.* at 9. We agree that, sometimes, following the literal terms of a statute would frustrate the legislative intent that is evident in the statute. But courts must be very careful about departing from the unambiguous language of a statute in the name of avoiding "injustice," "absurdity," or supposed offenses against "common sense." That sort of logic is perilous. It can easily turn into a rationalization for a judicial rewriting of the statute:

> "[T]o maintain the separation of the legislative and judicial branches and avoid compromising our fidelity to the text, we should be extremely reluctant to second-guess the clear language of legislation ***. [Citation.] Whenever a court disregards the clear language of legislation in the name of 'avoiding absurdity,' it

- 28 -

runs the risk of implementing its own notions of optimal public policy and effectively becoming a legislature. Interpreting legislation to mean something other than what it clearly says is a measure of last resort, to avoid 'great injustice' or an outcome that could be characterized, without exaggeration, as an absurdity and an utter frustration of the apparent purpose of the legislation. [Citation.]" (Internal quotation marks omitted.) *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 39.

¶ 67 We see no compelling reason to depart from the plain terms of the governing statutes in this case. We decline to effectively rewrite the statutes by inserting exceptions, conditions, or limitations that lack any basis in the statutory text. See *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 24. Under section 23.4 of the Sanitary Act (70 ILCS 2405/23.4 (West 2018)), the Board of the Sanitary District has the discretionary power to approve or deny a legally sufficient petition for annexation of territory to the Sanitary District. Section 23.4 places no limits on that discretion. Under section 3 of the Intergovernmental Cooperation Act (5 ILCS 220/3 (West 2018)), the Sanitary District may agree to exercise its power "jointly"—that is, collaboratively or cooperatively—with the City of Champaign by approving annexations to the Sanitary District only on the condition that the owner of the territory to be annexed enters into a municipal annexation agreement with the City of Champaign. Such coordination or cooperation between the Sanitary District and the City of Champaign is allowable, section 3 says, "except where specifically and expressly prohibited by law." *Id.* We are unaware of any law "specifically and expressly prohibit[ing]" the Board of the Sanitary District from conditioning its approval of a petition for annexation to the Sanitary District upon the petitioner's entering into a municipal annexation agreement, as the Sewer Agreement

requires. *Id.* Nowhere does the Illinois Municipal Code *specifically* prohibit such an intergovernmental contract. Section 11-15.1-1 (65 ILCS 5/11-15.1-1 (West 2018)) allows an annexation agreement regardless of whether the requirements in section 7-1-13 for a unilateral annexation are met. No condition, limitation, or exception written into the text of section 11-15.1-1 or any other statute, as far as we know, forbids the Sanitary District, the City of Urbana, and the City of Champaign from incentivizing or leveraging owners of unincorporated territory to enter into a municipal annexation agreement as a condition of being allowed to annex the territory to the Sanitary District.

¶ 68        This is not to ignore or minimize plaintiff's predicament. Undeniably, plaintiff has been subjected to coordinated annexation leverage. As plaintiff points out, plaintiff cannot even build a single residence on the 100 acres and install a private septic system. Champaign County has passed an ordinance providing as follows: "No CONSTRUCTION PERMIT shall be issued for construction of a PRIVATE SEWAGE DISPOSAL SYSTEM where a PUBLIC SEWER SYSTEM is available unless a physical barrier or local ordinance exists which prevents connection to the PUBLIC SEWER SYSTEM." Champaign County Ordinance No. 969, § 6.2.5(A) (eff. Sept. 1, 2015). Defendants, however, have not exceeded their statutory powers, and if such annexation leverage is undesirable, the remedy is with the legislature.

¶ 69                    D. The Claim of Extraterritorial Zoning

¶ 70        In March 2011, pursuant to section 11-12-6 of the Illinois Municipal Code (65 ILCS 5/11-12-6 (West 2010)), the City of Champaign adopted a comprehensive plan, the "Champaign Tomorrow Comprehensive Plan." Because of its adoption of this comprehensive plan, section 11-12-5 (*id.* § 11-12-5) allowed the City of Champaign to pass ordinances "exercis[ing]

subdivision control over properties within one and one-half (1.5) miles from the City of Champaign's corporate boundaries" (to quote from the first amended complaint).

¶ 71    Specifically, section 11-12-5(1) provides:

"The plan, as recommended by the plan commission and as thereafter adopted in any municipality in this state, may be made applicable, by the terms thereof, to land situated within the corporate limits and contiguous territory not more than one and one-half miles beyond the corporate limits and not included in any municipality. Such plan may be implemented by ordinances (a) establishing reasonable standards of design for subdivisions and for resubdivisions of unimproved land and of areas subject to redevelopment in respect to public improvements as herein defined; (b) establishing reasonable requirements governing the location, width, course, and surfacing of public streets and highways, alleys, ways for public service facilities, curbs, gutters, sidewalks, street lights, parks, playgrounds, school grounds, size of lots to be used for residential purposes, storm water drainage, water supply and distribution, sanitary sewers, and sewage collection and treatment; and (c) may designate land suitable for annexation to the municipality and the recommended zoning classification for such land upon annexation." *Id.* § 11-12-5(1).

It appears, then, that "subdivision control," as plaintiff terms it, can cover a lot of things. And, besides, in the absence of a statute expressly and specifically giving the State exclusive control over subdivision regulation (see *Better Government Ass'n v. Village of Rosemont*, 2017 IL App (1st) 161957, ¶ 32), the City of Champaign, as a home-rule unit (*Johnny Bruce Co. v. City of Champaign*, 24 Ill. App. 3d 900, 902 (1974)), may adopt any subdivision ordinance it sees fit to adopt. The City of Champaign, "a home rule unit, may exercise any power pertaining to its

- 31 -

government and affairs," including the power of requiring a municipal annexation agreement as a condition of approving a subdivision plat. *Better Government Ass'n*, 2017 IL App (1st) 161957, ¶ 32.

¶ 72    And yet, plaintiff points out in the first amended complaint, "subdivision control," extensive as it is, must not be confused with zoning. All that the City of Champaign's comprehensive plan can do is recommend a zoning classification for the land, upon annexation. See *id.* Plaintiff further points out that, because Champaign County has adopted its own zoning ordinance (Champaign County Zoning Ordinance (as amended through Aug. 23, 2018)), section 11-13-1 of the Illinois Municipal Code (65 ILCS 5/11-13-1 (West 2018)) forbids the City of Champaign to extend its zoning regulations outside its corporate limits. Therefore, plaintiff's property is not subject to the zoning ordinances of the City of Champaign, although (as we understand plaintiff to acknowledge) plaintiff's property is subject to the subdivision ordinances of the City of Champaign—the "subdivision control" to which plaintiff refers in its first amended complaint.

¶ 73    Under the Subdivision Ordinance adopted by the City of Champaign, if the property to be subdivided is outside city limits and will connect to the city's sewer system or to the sewer system of the Sanitary District, approval of a final plat is conditional on the owner's (1) petitioning for annexation to the city or (2) executing an annexation agreement with the city. Specifically, the Subdivision Ordinance provides as follows:

> "A final plat shall not be approved where the approved engineering plans provide
> for connection to any part of the sanitary sewer system of the City or the Urbana-
> Champaign Sanitary District, unless the land is within the City, or the owner of the
> subdivision has submitted to the City a legally sufficient petition to annex, or the

City and owner have executed an Annexation Agreement." Champaign Municipal Code § 31-111 (adopted Oct. 7, 2003).

¶ 74　　　　Plaintiff observes in the first amended complaint: "Any plat of subdivision necessary to develop [plaintiff's] [p]roperty will necessarily include plans that provide for connection to a part of the sanitary sewer system of the Sanitary District." Consequently, the City of Champaign, which has "subdivision control" over plaintiff's property, "will require [p]laintiff to submit to annexation or execute an annexation agreement" before the city approves a subdivision plat. Plaintiff complains that annexation of the property to the City of Champaign "will result in [p]laintiff being subject to the City of Champaign's zoning regulations upon the [p]roperty rather than being subject to the zoning regulations of Champaign County as the [p]roperty currently is."

¶ 75　　　　In its brief, plaintiff asserts: "An intergovernmental agreement that results in the expansion of zoning authority outside city limits to an area within one and one-half miles beyond the city limits is expressly forbidden by [section 11-13-1 of the Illinois Municipal Code (65 ILCS 5/11-13-1 (West 2018))]." The intergovernmental agreement at issue in this case is the Sewer Agreement. It is unclear how the Sewer Agreement is even relevant in this context. Sewer Agreement or no Sewer Agreement, the Subdivision Ordinance requires plaintiff to agree to the municipal annexation of the land as a condition of obtaining approval of a final plat. After plaintiff enters into an annexation agreement with the City of Champaign, the land will be "subject to the ordinances, control, and jurisdiction of the annexing municipality in all respects the same as property that lies within the annexing municipality's corporate limits." *Id.* § 11-15.1-2.1(a). So, it is true, after the execution and adoption of the annexation agreement, the zoning of plaintiff's

property by the City of Champaign would be extraterritorial—but it would be extraterritorial zoning authorized by section 11-15.1-2.1(a).

¶ 76    For that reason, an Attorney General opinion from 1976 on which plaintiff relies is inapplicable. It answered a question that is not raised in the present case. The state's attorney of McHenry County asked the Attorney General whether McHenry County and the City of Crystal Lake could enter in an intergovernmental cooperation agreement whereby McHenry County would transfer its zoning authority to the City of Crystal Lake. 1976 Ill. Att'y Gen. Op. No. S-1029, at 7, https://illinoisattorneygeneral.gov/opinions/1976/S-1029.pdf    [https://perma.cc/UA7U-5LAN]. The Attorney General's answer was no. He gave a three-pronged rationale for his negative answer. First, McHenry County had adopted its own zoning ordinance. *Id.* at 5. Second, section 11-13-1 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, ¶ 11-13-1) forbade a municipality to exercise zoning powers outside its corporate limits if the county had adopted its own zoning ordinance or, more precisely, " 'if the county *** ha[d] adopted "AN ACT in relation to county zoning," approved June 12, 1935[,] as amended' [(Ill. Rev. Stat. 1973, ch. 34, ¶ 3151 *et seq.*)]." 1976 Ill. Att'y Gen. Op. No. S-1029, at 3-4, https://illinoisattorneygeneral.gov/opinions/1976/S-1029.pdf [https://perma.cc/UA7U-5LAN] (quoting Ill. Rev. Stat. 1973, ch. 24, ¶ 11-13-1). Third, under article VII, section 10(a), of the Illinois Constitution (Ill. Const. 1970, art. VII, § 10(a)) and sections 3 and 5 of the Intergovernmental Cooperation Act (Ill. Rev. Stat. 1973, ch. 127, ¶¶ 743, 745), an intergovernmental cooperation agreement could not transfer power from one unit of local government to another if statutory law forbade the transferee from exercising that power. 1976 Ill. Att'y Gen. Op. No. S-1029, at 7, https://illinoisattorneygeneral.gov/opinions/1976/S-1029.pdf [https://perma.cc/UA7U-5LAN]. In short, statutory law forbade the City of Crystal Lake to exercise extraterritorial zoning since McHenry County had adopted its own zoning ordinance.

Therefore, McHenry County could not enter into an intergovernmental agreement with the City of Crystal Lake whereby McHenry County would transfer its zoning powers to the City of Crystal Lake.

¶ 77 Although plaintiff neglects to so mention, the Attorney General wrote: "This opinion is limited to the facts and issues of this instance and should not be construed as defining or interpreting the sweep of section 10(a) of article VII [(Ill. Const. 1970, art. VII, § 10(a))] in other factual situations." 1976 Ill. Att'y Gen. Op. No. S-1029, at 8, https://illinoisattorneygeneral.gov/opinions/1976/S-1029.pdf [https://perma.cc/UA7U-5LAN]. The facts and issues in the present case are significantly different from those the Attorney General addressed. The crucial difference is this. In the event that plaintiff and the City of Champaign entered into an annexation agreement, section 11-15.1-2.1(a) of the Illinois Municipal Code (65 ILCS 5/11-15.1-2.1(a) (West 2018)) would make plaintiff's land "subject to the ordinances, control, and jurisdiction of the annexing municipality in all respects the same as property that lies within the annexing municipality's corporate limits." In that event, the general statutory prohibition in section 11-13-1 of the Illinois Municipal Code (65 ILCS 5/11-13-1 (West 2018)) would still exist. But section 11-15.1-2.1(a), being specific to annexation agreements, would serve as an exception to the general prohibition in section 11-13-1. See *People v. Penrod*, 316 Ill. App. 3d 713, 718 (2000) ("Where there is one statute or a provision thereof dealing with a subject in general and comprehensive terms and another statute or provision dealing with a part of that same subject in a more minute and particular way, the particular enactment is held to qualify and to be operative as against the general provisions.").

¶ 78 E. Plaintiff's Due Process Theory

¶ 79        Plaintiff argues that "[c]oerced annexation violates due process." The fourteenth amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. Likewise, the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty[,] or property without due process of law." Ill. Const. 1970, art. I, § 2. In both of those constitutional provisions, the protectable interests are life, liberty, and property.

¶ 80        "The starting point, in any due process analysis, is a determination of whether one of these protectable interests—life, liberty or property—is present, for if there is not, no process is due." (Internal quotation marks omitted.) *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367, 405 (1992). Plaintiff claims that "[c]oerced annexation violates [p]laintiff's property rights." In plaintiff's view, "units of local government [have] band[ed] together" to deprive plaintiff of property without due process of law. Citing *Groenings v. City of St. Charles*, 215 Ill. App. 3d 295, 308 (1991), plaintiff argues that "[t]he application of land use regulations offends substantive due process rights related to property if the application is arbitrary, unreasonable, or capricious and does not bear a substantial relationship to the public welfare."

¶ 81        *Groenings*, however, tends to undercut plaintiff's argument. For, in *Groenings*, the appellate court concluded that "[d]eprivation of mere hoped-for economic gain" failed to qualify as a deprivation of property in the constitutional sense. *Id.* at 309. The factual context of that holding in *Groenings* was essentially as follows. The plaintiffs owned 80 acres of unincorporated territory in Kane County, Illinois, between the city of St. Charles and the village of Wayne. *Id.* at 298. Because the property would have been more valuable inside St. Charles than outside (*id.* at 308), the plaintiffs petitioned St. Charles to annex the property (*id.* at 299). St. Charles denied the plaintiffs' petition for annexation, and the same day that St. Charles did so, it passed an ordinance

- 36 -

authorizing the execution of a boundary agreement with Wayne. *Id.* at 298. In the boundary agreement, St. Charles and Wayne agreed to neither annex nor exercise zoning or subdivision control beyond their respective sides of the agreed-upon boundary line. *Id.* The boundary agreement prohibited St. Charles from annexing the plaintiffs' property. *Id.*

¶ 82 Stung by the denial of their annexation petition and learning of the boundary agreement, the plaintiffs sued St. Charles and Wayne. *Id.* at 299. The plaintiffs claimed that the boundary agreement violated their right to substantive due process by "infring[ing]" on "their right to the reasonable use of their property." *Id.* at 308.

¶ 83 "This cannot be so," the appellate court responded. *Id.* What had St. Charles and Wayne done to change the present use of the plaintiffs' property? Nothing. *Id.* The property always had been, and still was, located in unincorporated Kane County. *Id.* The property still was subject to the county zoning regulations, just as before. *Id.* "The uses of the property currently possible within the county ha[d] not changed." *Id.* The most that plaintiffs could say was that, because of the boundary agreement, they might not have been able to get as much money out of the property as they possibly could have gotten if the property were annexed to St. Charles. *Id.* "What plaintiffs really seem to want," the appellate court observed, "is for St. Charles to *act* to *increase* the value of their property. This St. Charles is not obligated to do." (Emphases in original.) *Id.* In sum:

> "[T]he action taken by St. Charles and Wayne had no effect on the [plaintiffs']
> existing rights to use their property. The present zoning and/or uses of the land
> remained exactly as they had been before the agreement. No new regulations or
> restrictions were imposed. No existing permissible uses were denied or limited."
> *Id.* at 309.

¶ 84       In other words, it was not as if the passage of a new regulation had yanked the carpet out from under the plaintiffs' feet, depriving them of a valuable land use that they enjoyed before the passage of the regulation. The plaintiffs' discontent, rather, was that the boundary agreement had shut the door to one option: not for the present use of their land but for a possible future use. See *id.* But that possible future use—the use of the land as annexed territory within the city limits of St. Charles—was never more than an expectation to begin with. *Id.* Even without the boundary agreement, St. Charles might well have decided against annexation. *Id.* The holding in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972), was apropos: "To have a property interest[,] a person must have more than a unilateral expectation of it; rather, he must have a legitimate claim of entitlement to it." *Groenings*, 215 Ill. App. 3d at 307. "Deprivation of mere hoped-for economic gain" was, in the appellate court's view, "a minimal incursion *** into [the] plaintiffs' property rights"—"if it [was] an incursion at all." *Id.* at 309. The disappointment of a unilateral expectation was "not a deprivation in the constitutional sense and [did] not raise due process concerns." *Id.*

¶ 85       In the present case, plaintiff's due process claim is even weaker than the due process claim in *Groenings*. The plaintiffs in *Groenings* had the argument that the boundary agreement was a change in the legal landscape that happened during their tenure as landowners. In the present case, by contrast, plaintiff does not allege that the rules were changed after plaintiff bought the property. Plaintiff's case is not like *City of Chicago v. Wells*, 236 Ill. 129, 129-30 (1908), for example, in which the appellant owned a tract of land that had never been subdivided and the City of Chicago, on its own initiative and without the appellant's consent, passed an ordinance subdividing the land into strips of 25 feet each. Nothing comparable happened in this case. It is not that plaintiff bought the land and that, afterward, a new set of land-use rules were adopted.

Instead, the story that plaintiff tells in the first amended complaint is essentially this. Creighton, plaintiff's managing director, having attended elementary school, junior high school, and high school in Champaign, was "now seeking to further invest in his community." The contemplated investment would entail developing the land as a subdivision. To get the project started, plaintiff approached the local governmental agencies. It was then that plaintiff discovered various ordinances and intergovernmental agreements, which have been in force for decades and which plaintiff finds to be unpalatable. Given that narrative, the observations that the appellate court made in *Groenings* likewise could be made in the present case. For all that appears in the first amended complaint, ever since plaintiff bought the property, "[t]he uses of the property currently possible within the county have not changed." *Groenings* 215 Ill. App. 3d at 308. "No new regulations or restrictions were imposed. No existing permissible uses were denied or limited." *Id.* at 309. There has been no regulatory devaluation of what plaintiff paid for. Since plaintiff's purchase of the property, it is unclear how plaintiff has been deprived of a property interest.

¶ 86        As the United States Supreme Court explained in *Roth*, 408 U.S. at 577, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." That is what a property interest is—a legitimate claim of entitlement—and the legitimacy of the claim depends on a legal authority outside the Constitution, such as state law. To quote again from *Roth*:

> "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or

understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

¶ 87     We are unaware of any Illinois case addressing a claim of entitlement to subdivision approval. Therefore, we have looked for decisions from other jurisdictions that might be informative. One decision that seems relevant and soundly reasoned is *Bower Associates v. Town of Pleasant Valley*, 761 N.Y.S.2d 64 (App. Div. 2003). In that case, the plaintiff brought a civil-rights action (see 42 U.S.C. § 1983 (2000)) against a town and its planning board on the ground that they had denied the plaintiff's application for subdivision approval. *Bower Associates*, 761 N.Y.S.2d at 66. The essence of the plaintiff's claim was a deprivation of property without due process of law. *Id.* at 68.

¶ 88     Because the plaintiff in *Bower* alleged a deprivation of property, the plaintiff had to "show the existence of a protectable property interest." *Id.* "Protectable property interests arise," the reviewing court explained, "when there is a legitimate claim of entitlement pursuant to a State or local law." *Id.* A claim of entitlement would be legitimate, and a protectable property interest would arise, only if "the municipal authority [were] required to grant the application upon ascertainment that certain objectively ascertainable criteria ha[d] been met." (Internal quotation marks omitted.) *Id.* Under New York law, subdivision approval, instead of being an entitlement, was "discretionary." *Id.* "[T]he presence of *** discretion preclude[d] any legitimate claim of entitlement." (Internal quotation marks omitted.) *Id.* The reviewing court concluded that, given the discretionary nature of municipal decision-making in this field, the plaintiff lacked "a protectable property interest in subdivision approval." *Id.* at 69.

¶ 89     In the present case, plaintiff fails to explain how, under objectively ascertainable criteria set forth in state or local law—criteria that eliminate local governmental discretion—

plaintiff is entitled to subdivision approval. See Champaign Municipal Code § 31-104 (adopted Mar. 5, 2002) (providing that "[t]he provisions of this chapter [(chapter 31, 'Subdivision Regulations')] shall be held to be the *minimum* requirements for the promotion of the public health, safety and general welfare" (Emphasis added.)). Therefore, plaintiff has no protectable property interest in subdivision approval. It is true, as plaintiff notes, that "[l]egislative decisions made by municipalities are subject to review only for arbitrariness as a matter of substantive due process." (Internal quotation marks omitted.) *In re Application of the Park District of La Grange*, 2013 IL App (1st) 110334, ¶ 75. But there can be no arbitrary deprivation in violation of due process unless there was, in the first place, a protectable interest of which the person could be deprived. Plaintiff has a desire for subdivision approval but no property interest in subdivision approval. The City of Champaign could not arbitrarily and capriciously deprive plaintiff of a property interest that plaintiff lacked in the first place.

¶ 90      The same analysis applies to the question of annexation to the Sanitary District. Plaintiff fails to explain how, under objectively ascertainable criteria set forth in state or local law, plaintiff is *entitled* to an approval of its petition for annexation to the Sanitary District. Instead, it appears that the Board of the Sanitary District has wide discretion to deny the petition. While it is true that the Board's discretion to *approve* the petition is limited by the Sewer Agreement, the Board's discretion to *deny* the petition appears to be unlimited. We are unaware of any objective criteria, legally binding on the Board, that would bestow on plaintiff a property interest in not being denied. Absent a property interest, plaintiff has no legally sufficient due process claim against the Sanitary District any more than plaintiff has a legally sufficient due process claim against the City of Champaign or any other of the municipal defendants.

- 41 -

¶ 91    Even if plaintiff had a property interest in subdivision approval by the City of Champaign and in annexation to the Sanitary District, we would decline to hold that those defendants acted arbitrarily and capriciously by insisting on plaintiff's execution of a municipal annexation agreement, as the Sewer Agreement required. See *Park District of La Grange*, 2013 IL App (1st) 110334, ¶ 75. Such an insistence was a legislative decision having a real and substantial relation to the public health, safety, and general welfare. See *id.* The Sewer Agreement makes sense. The problems afflicting Boneyard Creek are stubborn and, most likely, expensive to remedy. Every dollar that the Sanitary District spent on Boneyard Creek was one dollar less that the Sanitary District had to spend on its core mission of maintaining the sewer system. The City of Urbana and the City of Champaign, whose residents were subjected to the toxic floodwaters of Boneyard Creek, offered the Sanitary District a way out. These municipalities would assume responsibility for the maintenance and improvement of Boneyard Creek, thereby relieving the Sanitary District of that financial burden, if the Sanitary District would do something for them: if any owner of unincorporated territory petitioned for annexation to the Sanitary District, the Board of the Sanitary District would require, as a condition of granting the petition, that the landowner execute an annexation agreement with the municipality. This agreed-upon condition seems reasonably defensible. Taming Boneyard Creek and cleaning it up will undoubtedly be expensive and an added financial burden to the City of Urbana and the City of Champaign. An expansion of their tax base is, therefore, justifiable. Also, because the problem of Boneyard Creek, which the City of Urbana and the City of Champaign are taking on, is largely a problem of stormwater management, the City of Urbana and the City of Champaign understandably want some control over the extent to which their outskirts will be paved with impervious surfaces. Viewed that way,

the Sewer Agreement is "a rational means to accomplish a legitimate purpose." (Internal quotation marks omitted.) *Id.*

¶ 92          F. The Right to Choose Whether to Participate in the Political Process

¶ 93          1. *Hoepker*

¶ 94          Plaintiff quotes from the City of Champaign's "Curtis Road Interchange Area Master Plan": "Without annexation into the City of Champaign, the development will not be approved for sanitary sewer service or other necessary services." Then quoting from a decision by the Supreme Court of Wisconsin, *Hoepker v. City of Madison Plan Comm'n*, 563 N.W.2d 145, 151 (Wis. 1997), plaintiff contends that this coercive condition denies plaintiff its "political right to participate in an annexation proceeding by voluntarily deciding whether to support or oppose annexation."

¶ 95          In *Hoepker*, the plaintiffs wanted to develop 49 acres into a residential subdivision. *Id.* at 146. Because the land was within three miles of the City of Madison, the city had "extraterritorial plat approval jurisdiction over it." *Id.* at 147. The city approved the plaintiffs' preliminary plat—but only on condition that the plaintiffs agreed to an annexation of the territory to the city. *Id.* at 148. (There was a second condition, irrelevant to our discussion, that the plat be reconfigured to provide "an adequate open space corridor." *Id.*) The city explained to the plaintiffs that, without public water and a public sewage system, water quality problems were likely to develop. Nitrates had been accumulating in Wisconsin wells. And it was much cheaper to install water and sewer lines before the land was built on than afterward. *Id.* at 147.

¶ 96          Nevertheless, the plaintiffs balked at the condition of annexation, and they challenged the condition in court. Ultimately, the case came before the Supreme Court of Wisconsin. *Id.* at 149. After identifying the applicable standards of review—deference to the city's

factual reasons for conditionally approving the plat but a *de novo* determination of constitutional and statutory authority (*id.*)—the supreme court scrutinized the statutory provision under which the city claimed authority to impose its condition of annexation.

¶ 97         Section 236.45 of the Wisconsin statutory code (Wis. Stat. § 236.45 (West 1996)) pertained to local subdivision regulation. Subsection (1) provided that the purpose of section 236.45 was " 'to promote the public health, safety[,] and general welfare of the community' " and to " 'further the orderly layout and use of land.' " *Hoepker*, 563 N.W.2d at 150 n.14 (quoting Wis. Stat. § 263.45(1) (West 1996)). Subsection (2) provided as follows:

> " 'To accomplish the purposes listed in sub[section] (1), any municipality, town[,] or county which has established a planning agency may adopt ordinances governing the subdivision or other division of land which are more restrictive than the provisions of this chapter.' " *Id.* at 150 (quoting Wis. Stat. § 263.45(2) (West 1996)).

In reliance on subsection (2), the city had adopted a more restrictive ordinance, which provided that the city might "require an annexation agreement as part of the preliminary plat approval process." *Id.* The crucial issue, as the supreme court saw it, was whether this ordinance was truly authorized by section 236.45 (Wis. Stat. § 236.45 (West 1996)). *Hoepker*, 563 N.W.2d at 150.

¶ 98         The supreme court previously had interpreted section 236.45 as giving cities broad discretion in subdivision control, provided that the ordinances were "not contrary, expressly or by implication, to the standards set up by the legislature." (Emphasis and internal quotation marks omitted.) *Id.* "The legislature ha[d] set forth the standards for annexation in chapter 66" of the Wisconsin statutory code (Wis. Stat., ch. 66 (West 1996)), a chapter titled "General Municipality Law." *Hoepker*, 563 N.W.2d at 150. Chapter 66 created "safeguards so that [n]o populated fringe

area [might] become part of the city until the majority of electors and/or property owners in a particular area desire[d] to annex." (Internal quotation marks omitted.) *Id.* Under chapter 66, the electors and property owners would signify such a desire by signing a petition for annexation. See *id.* at 150-51; Wis. Stat. § 66.0217(2), (3)(a), (3)(b) (West 1996)).

¶ 99 The signing of an annexation petition, the Supreme Court of Wisconsin held, was "more than the exercise of a private right or of a property right." (Internal quotation marks omitted.) *Hoepker*, 563 N.W.2d at 150. It was, rather, the exercise of a political right, like voting. *Id.* at 150-51. Because the signing of an annexation petition was like voting, it should not be tainted by crass commercialism: "The signing of an annexation petition, like voting, constituting participation in a governmental process is governed by a higher standard of conduct than prevails in the marketplace—votes are not a commodity of commerce." (Internal quotation marks omitted.) *Id.* at 151. In other words, under chapter 66 of the Wisconsin statutes, signing an annexation petition was analogous to voting, and voting was not supposed to be degraded to a contractual transaction, *i.e.*, a signature on the annexation petition in return for subdivision approval. Municipalities were forbidden to "coerce or unfairly induce an elector and/or property owner into agreeing to annexation." *Id.* at 150. By conditioning approval of the plaintiffs' preliminary plat on their agreement to sign an annexation petition, the city had had "unduly" and "improper[ly]" tried to "influenc[e]" and "coerc[e]" the plaintiffs, "contrary to the safeguards provided in ch[apter] 66." *Id.* at 151.

¶ 100 In our perusal of chapter 66 of the Wisconsin statutes, we have been unable to find any provision authorizing the execution of an *annexation agreement* between a landowner and a municipal government. That would explain the Wisconsin Supreme Court's conclusion that the

City of Madison was "unduly influencing a property owner to sign *an annexation petition*, contrary to the safeguards provided in ch[apter] 66." (Emphasis added.) *Id.*

¶ 101    *Hoepker* is distinguishable because Illinois statutory law, in contrast to Wisconsin statutory law, explicitly authorizes the negotiation and execution of an *annexation agreement* between a landowner and a municipality. Section 11-15.1-1 of the Illinois Municipal Code provides:

> "The corporate authorities of any municipality may enter into an annexation agreement with one or more of the owners of record of land in unincorporated territory. That land may be annexed to the municipality in the manner provided in Article 7 [(65 ILCS art. VII)] at the time the land is or becomes contiguous to the municipality. The agreement shall be valid and binding for a period of not to exceed 20 years from the date of its execution.
>
> Lack of contiguity to the municipality of property that is the subject of an annexation agreement does not affect the validity of the agreement ***." 65 ILCS 5/11-15.1-1 (West 2018).

Thus, the execution of an annexation agreement does not automatically annex the land to the municipality: once the land becomes contiguous to the municipality, the annexation procedures in article VII still have to be followed. An annexation agreement is not an annexation.

¶ 102    Even so, practical consequences could immediately follow from the municipal adoption of an annexation agreement executed by the landowner. With exceptions for some counties and properties (not relevant here), "property that is the subject of an annexation agreement adopted under this Division [(Division 15.1, titled 'Annexation Agreements' (*id.* §§ 11-15.1-1 to 11-15.1-5))] is subject to the ordinances, control, and jurisdiction of the annexing municipality in

all respects the same as property that lies within the annexing municipality's corporate limits." *Id.* § 11-15.1-2.1(a). This could be regarded as a significant concession to the municipality.

¶ 103 But the landowner can negotiate for concessions, too. For example, the landowner can negotiate for changes to ordinances and the master plan (*id.* § 11-15.1-2(b)), a limitation upon increases in permit fees (*id.* § 11-15.1-2(c)), or an abatement of property taxes (*id.* § 11-15.1-2(e-5)).

¶ 104 In short, the give-and-take of commercialism is exactly what the Illinois General Assembly envisions in division 15.1. "By definition, an annexation agreement is a contract between a municipality and an owner of land in unincorporated territory." *Doyle v. Village of Tinley Park*, 2018 IL App (1st) 170357, ¶ 28; see also *United City of Yorkville v. Fidelity & Deposit Co. of Maryland*, 2019 IL App (2d) 180230, ¶ 74. Section 11-15.1-2 of the Illinois Municipal Code (65 ILCS 5/11-15.1-2 (West 2018)) is broad and inexhaustive as to the contractual terms that the landowner and the municipality can negotiate. The list of examples in section 11-15-1.2 ends with a catchall: "Any other matter not inconsistent with the provisions of this Code, nor forbidden by law." *Id.* § 11-15.1-2(f). To put it differently, section 11-15.1-2(f) authorizes any term in an annexation agreement unless that term is incompatible with a provision of the Illinois Municipal Code or unless the law positively forbids that term. We are aware of no provision of the Illinois Municipal Code that necessarily would be violated if a landowner and a municipality agreed to subdivision approval in return for a municipal annexation.

¶ 105                                    2. *Hussey*

¶ 106 On the authority of *Hussey v. City of Portland*, 64 F.3d 1260 (9th Cir. 1995), plaintiff maintains that, by withholding subdivision approval unless plaintiff enters into an annexation agreement, the City of Champaign unconstitutionally burdens plaintiff's right to vote.

¶ 107	In *Hussey*, the City of Portland offered a sewer-connection subsidy to nonresident electors in an area known as "Mid-County" who irrevocably consented to an annexation. *Id.* at 1262. The consent forms stated that, if Portland attempted to annex Mid-County by election, " 'this agreement [would] constitute[ ] a waiver of the right to vote *** [and] such persons [would] count as yes votes.' " *Id.* at 1263.

¶ 108	The Ninth Circuit held that, "[b]ecause the consent forms [were] analytically like votes, and [were] a substitute for them, legally they [had to] be treated as votes." *Id.* at 1265. The Portland ordinance "severely and unreasonably interfere[d] with the right to vote," "disproportionately affect[ing] the poor," like a poll tax. *Id.* at 1266. Therefore, the restrictions were subject to strict scrutiny. *Id.* The ordinance failed strict scrutiny and, hence, was "an unconstitutional infringement on the fundamental right to vote." *Id.*

¶ 109	But the right to vote can be infringed only if there are voters. That is why the Ninth Circuit distinguished a case from the Sixth Circuit, *Carlyn v. City of Akron*, 726 F.2d 287 (6th Cir. 1984), and a case from the Fourth Circuit, *Berry v. Bourne*, 588 F.2d 422 (4th Cir. 1978). The Ninth Circuit observed: "Neither of the annexation methods at issue in those cases [(*Carlyn* and *Berry*)] granted electors any say in the proceedings; the consent of landowners alone was required. Without the participation of voters, there can be no voting." *Hussey*, 64 F.3d at 1264.

¶ 110	An " 'elector' means anyone registered to vote." 65 ILCS 5/7-1-1.1 (West 2018). Plaintiff, being a Florida limited liability company, is not, and can never be, registered to vote. Thus, plaintiff is not, and can never be, an elector. Plaintiff does not allege that any electors reside on the land. It seems unlikely that any electors would do so while the land is undeveloped and lacks a sewer system. Consequently, plaintiff, the landowner, would be the only signatory to an annexation petition, which would "state that no electors reside therein" (see *id.* § 7-1-8). *Hussey*,

- 48 -

by its own terms—by its own distinguishing of *Carlyn* and *Berry*—is distinguishable from the present case.

¶ 111                                    III. CONCLUSION

¶ 112          The Sewer Agreement, the Sanitary District Ordinance, and the Subdivision Ordinance are constitutionally and statutorily authorized and violate no constitutional right. Therefore, we affirm the circuit court's judgment.

¶ 113          Affirmed.

**No. 4-19-0850**

| | |
|---|---|
| **Cite as:** | *I-57 & Curtis, LLC v. Urbana & Champaign Sanitary District*, 2020 IL App (4th) 190850 |
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 18-MR-867; the Hon. Jason Matthew Bohm, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew R. Trapp and Jason E. Brokaw, of Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, and Kristina M. Swanson, of Wooden McLaughlin LLP, of Indianapolis, Indiana, for appellant. |
| **Attorneys for Appellee:** | James A. Martinkus, of Erwin, Martinkus & Cole, Ltd., of Champaign, for appellee Urbana and Champaign Sanitary District.<br><br>Thomas S. Yu and Frederick Stavins, of Champaign, for appellee City of Champaign.<br><br>James D. Green, of Thomas Mamer LLP, of Champaign, for appellee Village of Savoy.<br><br>Joseph P. Chamley and Amanda Riess, of Evans, Froehlich, Beth & Chamley, of Champaign, for appellee Village of Bondville.<br><br>James L. Simon and Curt S. Borman, of Urbana, for appellee City of Urbana. |